**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOHN ZIMNY, individually and as )
Father and legal guardian of )
BZ, a minor )
)
    Plaintiff, )
)
)
      v. )   Case No. 1:22-cv-4512
)
)   JURY TRIAL DEMANDED
)
GENEVA COMMUNITY UNIT SCHOOL )
DISTRICT 304, TERRY BLEAU, and )
DANIEL JONES )
)
    Defendants. )

## AMENDED COMPLAINT

Plaintiff, JOHN ZIMNY, individually and as the legal guardian of BZ, a minor, and BZ, a

minor, by and through undersigned counsel, hereby for their Complaint against the Geneva

Community Unit School District 304 ("District 304"), Terry Bleau and Daniel Jones for violations

of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a), 34 C.F.R. Part 104, 34 C.F.R.

Part 104, violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 – 12189,

and intentional infliction of emotional distress, states as follows:

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over Counts I to IV and County VI of

this action pursuant to 28 U.S.C. § 1331 as the Plaintiff's claims alleged herein arise under the

Rehabilitation Act (the "Rehabilitation Act"), 29 U.S.C. § 794, et seq. Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 – 12189; and the United States Constitution.

This Court has supplemental jurisdiction over Count V of this action pursuant to 28 U.S.C. §

1367.

1

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

### PARTIES

3.      Plaintiff JOHN ZIMNY is the natural father and legal guardian of BZ, a minor.

4.      Plaintiff JOHN ZIMNY and BZ, a minor are residents of the town of Geneva in the State of Illinois and at all relevant times were residents of the town of Geneva in the State of Illinois.

5.      BZ, a minor, is an individual with disabilities including Autism Spectrum Disorder Level 1, Attention Deficit Hyperactivity Disorder, Combined Presentation, Unspecified Anxiety Disorder, social anxiety and does not walk in a normal fashion. These disabilities substantially limit one or more of BZ'S major life activities and can negatively affect his interactions with people. At all relevant times, DISTRICT 304 was aware of and had knowledge of his multiple diagnoses, his disabilities and the effects those diagnoses and disabilities have on his actions of daily living and his interactions with people, especially adults.

6.      District 304 is a governmental entity agency, specifically a local education agency, which serves residents in the Geneva Illinois community.

7.      District 304 receives federal financial assistance.

8.      District 304 is a public entity under the ADA. 42 U.S.C. § 12131(1).

9.      District 304 is a "local educational agency" within the meaning of 29 U.S.C. § 794(b)(2)(B).

10.     District 304 is a recipient of federal financial assistance under the Rehabilitation Act.

11.     Geneva Middle School South is a District 304 school.

12.     At all times relevant, Terry Bleau was employed as a Principal at Geneva Middle School South and had knowledge of BZ's diagnoses and disabilities and the effects those diagnoses and disabilities have on his actions of daily living and his interactions with people, especially adults.

13.     At all times relevant, Daniel Jones was employed as an Assistant Principal at Geneva Middle School South and had knowledge of BZ's diagnoses and disabilities and the effects those diagnoses and disabilities have on his actions of daily living and his interactions with people, especially adults.

## FACTUAL BACKGROUND

14.     BZ attended Geneva Middle School South ("GMSS") as a seventh grader in the Fall of 2021. Prior to the Fall of 2021 BZ attended GMSS as a sixth grader.

15.     At all relevant times herein BZ was a student with the diagnoses and disabilities as set forth and described above.

16.     At all relevant times herein, District 304 had possession of BZ's student records and certain of his health records and Defendants knew BZ was a student with disabilities and diagnoses are described herein.

17.     According to the Diagnostic and Statistical Manual, Fifth Addition (DSM-V), published by the American Psychiatric Association and used as a diagnostic tool by physicians

and mental health professionals, Autistic Spectrum Disorder is characterized by several primary areas of dysfunction:

- Marked impairment in the use of multiple nonverbal behaviors to regulate social interaction (e.g., such as eye-to-eye gaze, facial expression, body postures, and gestures).
- Failure to develop peer relationships appropriate to developmental level.
- For a student with adequate speech, marked impairment in the ability to initiate or sustain a conversation with others.
- Demonstrates impaired ability with social communication.
- Demonstrates impaired ability with non-verbal communications.
- Unusual responses to sensory experiences heightened anxiety reactions to stressful situations and the need to take extra processing time to process and react to stressful situations.

18.     During BZ's attendance at GMSS, he was "mainstreamed," or placed into general education classes.

19.     At all relevant times herein, BZ was a physically small 12-year-old boy with physical limitations due to his disabilities. His physical limitations included not being able to walk in a normal manner.

20.     Because he is autistic and has social anxiety, BZ had difficulty making friends, was often withdrawn and reserved in social situations and in general at school including talking to himself or appearing to talk to himself, and walked differently than students without his disabilities in the hallways, the cafeteria, PE classes and when he was involved with school sports teams.

21.     At all times Defendants, District 304 and the District 304 personnel at GMSS, including all GMSS football coaches and his PE teacher (6th and 7th grade), Ryan Barabasz, knew that BZ was autistic and knew from observation and interaction with BZ, as well as his District

304 Special Education Case Manager that he exhibited the behaviors and disabilities described above.

22.    Since BZ was autistic and had the disabilities described herein BZ was assigned to a District 304 Special Education Case Manager / Counselor, Shelly Rolf, who worked at GMSS.

23.    Shelly Rolf was BZ's Special Education Case Manager / Counselor for his time as a student at GMSS and for the 2021-2022 school year and also during the 2020-2021 school year at GMSS.

24.    BZ's parents entrusted their young, intelligent, special needs child to the school personnel at GMSS for the 2021-2022 school year. BZ looked forward to having a good year and participating in every aspect of school life that he could - especially after essentially two previous years of Covid, Covid lockdowns, and little, if any, normal school life.

25.    In the Fall of 2021, BZ was a young, autistic, intelligent, special needs boy (only 12 years old) when he repeatedly complained to the District 304 and GMSS personnel in the Fall and into the Winter of 2021 about being a victim of multiple incidents of bullying while in school at GMSS.

26.    In the Fall of 2021, and after BZ started to speak up to the District 304 personnel at GMSS about him being a victim of multiple bullying incidents, a chain of behaviors and actions by Defendants and District 304 personnel towards BZ occurred that have left him both physically damaged and, more significantly, mentally / psychologically damaged.

27. The District 304 personnel at GMSS were the adults charged with protecting BZ, responding to his concerns and keeping him safe while he was in school.

28. At all times relevant District 304 had a written Code of Conduct, written Bullying Policies and a written School Suspension policy.

29. District 304's Code of Conduct Policy- Category III Behavior section states that Category III behavior is behavior [by a student or school personnel] that:

- Causes injury to the student himself or to others.
- Seriously disrupts the classroom.
- Seriously disrupts the school.
- Any reasonable person would label as gross misconduct.

Examples include but are not limited to: Verbal, physical, sexual, and written harassment, (teasing, coercive behavior and other offensive, or mean-spirited conduct) and all forms of racial, sexual and religious harassment (inappropriate touching, sexual advances, graffiti, sexually explicit drawings and pictures, inappropriate written and audio / video materials, negative physical contact, threatening or degrading language, jokes and gestures).

30. District 304's Bullying Policies state in pertinent part as follows. Bullying Policies (Student Discipline – 7:180 and 7:20) Bullying is prohibited by Board Policies 7:180 and 7:20 – Prevention of and Response to Bullying and Aggressive Behavior. It includes cyberbullying and is defined as any severe or pervasive physical or verbal act or conduct, including communication made in writing or electronically, directed toward a student or students that has or can be reasonably predicted to have the effect of one or more of the following:

A. Placing the student or students in reasonable fear of harm to the student's person or property.

B.  Causing a substantially detrimental effect on the student's physical or mental health.

C.  Substantially interfering with the student's academic performance.

D.  Substantially interfering with the student's ability to participate in or benefit from the services, activities, or privileges provided by a school.

31.     District 304's School Suspension Policy describes an in-school suspension (ISS) as follows. An in-school suspension is a disciplinary intervention assigned when a student has exhibited unacceptable behavior in which the desired outcome is a modification in behavior. Students serve an in-school suspension in a supervised area. While serving the suspension, students are required to work on school related assignments. Parents will be notified by phone of an in-school suspension. Loss of privileges may result from an ISS.

32.     At all relevant times Defendants and District 304 were required to apply the District 304 policies and procedures in a non-discriminatory manner and were required to not discriminate against students with disabilities such as BZBZ and to treat students such as BZBZ in the same way that they treat students without disabilities including the disabilities the Defendants knew BZBZ had.

33.     At all relevant times when disciplining a student with disabilities such as BZ had, the District 304 personnel are required to make sure that BZ's disability is taken into consideration and that the parents are provided the right to be notified and are notified of such discipline, and to question and appeal any such decision involving discipline.

## BULLYING INCIDENTS AT GENEVA MIDDLE SCHOOL
### Football Team Bullying

34.     In or about August of 2021, and in an effort to participate in as much of school life at GMSS as he could, BZ joined the GMSS football team because he wanted to try playing football, experience being on a team and knew that GMSS had a no-cut policy for the team,

meaning if he joined the football team he would be accepted and be a member of the team for that school year.

35.     In August 2021, the GMSS football team, including BZ, participated in supervised practices, drills, and other activities at GMSS.

36.     The GMSS football team's supervised practices, drills, and other activities at GMSS were supervised by coaches and other District 304 and GMSS personnel.

37.     During these GMSS football team practices, drills, and activities, BZ was harassed, bullied, mocked and criticized by other GMSS football team members.

38.      This GMSS football team harassment, bullying, mocking, and criticizing created an unsafe situation for BZ and caused BZ to fear for his safety when this harassment, bullying, mocking, and criticizing took place.

39.     On August 25, 2021, Lindsay Zimny, BZ's mother, alerted Shelly Rolf BZ's Special Education Case Manager / Counselor via email, that BZ was being verbally harassed, mocked, bullied, and criticized by some of his teammates on the football team and that this harassment, bullying, mocking, and criticizing was taking place, at times, in the presence of the coaching staff.

40.     Lindsay Zimny, BZ's mother also sent emails to all the football team coaches and copied Principal Terry Bleau regarding what was happening to BZ and BZ's reaction to the bullying and harassment in August of 2021.

41. Internal District 304 emails confirm that all coaches, Shelly Rolf, Principal Bleau and Assistant Principal Jones all received and reviewed Lindsay Zimny's emails regarding what was happening to BZ and BZ's reaction to the bullying and harassment in August of 2021.

42. As part of this harassment BZ was told multiple times by several players on his team that he "sucked" at football and that was the reason he didn't get much playing time. They also mocked, on multiple occasions, the way he walks and runs, which BZ has no control over, and which is characteristic of his problems with gross motor skills.

43. These verbal assaults on BZ by GMSS football team members continued after August 25, 2021 and continued throughout the football season and after the season ended.

44. BZ and his parents told the Assistant Principal Daniel Jones and the football coaching staff via email about the verbal and physical assaults and bullying and that it continued throughout the football season and after it ended.

45. BZ's parents and other family members followed up with Assistant Principal Jones multiple times about the harassment, bullying, and and assaults. Jones told BZ's family members that he would do something about it, but nothing was addressed and no action was taken by the GMSS administrators or the coaching staff to end or prevent the harassment.

46. BZ continued to be a member of the GMSS football team and could see that neither the GMSS administrators nor the coaching staff did anything to end or prevent the harassment and verbal and physical assaults on him.

47.     The unequal and unfairness in the "non-handling" of these complaints by the District 304 personnel and District 304's failure to take BZ's complaints seriously were very evident and also known to BZ and his parents.

48.     On September 3, 2021 BZ was with the GMSS football team watching a Geneva High School football team game.

49.     At that September 3, 2021 game event BZ was antagonized and physically attacked by Geneva Middle School South students.

50.     GMSS personnel set up, scheduled and coordinated the attendance by the GMSS football team at the Geneva High School football game on September 3, 2021.

51.      GMSS personnel accomplished the setup, scheduling and coordination of this event by emails to the team members parents and posting the invite on social media platforms such as Facebook and Twitter.

52.     Despite scheduling, coordinating and setting up this September 3, 2021 GMSS football game event and knowing what happened in August 2021, no District 304 personnel were in the bleachers in the student seating area at this GMSS football game event.

53.     At the September 3, 2021 GMSS football game event several of BZ's GMSS football teammates again verbally harassed, bullied, and mocked BZ.

54.     These verbal assaults were a continuation of the conduct reported by BZ's mother on August 25, 2021.

55.     BZ tried to walk away from this, but his football teammates increased their taunting, bullying, and mocking of BZ and they tried to goad him into fighting.

56.     BZ tried to walk away once more and multiple GMSS students grabbed onto him and when grabbing him, they ripped his neck chain off. This neck chain was a thin decorative silver neck chain that broke easily when it was ripped off BZ.

57.     When BZ went to pick up the broken neck chain, he was jumped again by some of the taunting GMSS students who were also members of the GMSS football team.

58.     At that same time other GMSS students tried to goad BZ into fighting back instead of trying to walk away. They repeatedly taunted him saying things such as, "What are you going to do, Zimny? Fight him."

59.     A friend helped pull BZ away from the football teammates who were physically attacking him.

60.     BZ's parents and BZ reported these assaults to Assistant Principal Jones per the directives from Principal Bleau that all future such incidents such as this were to be reported to Assistant Principal Jones.

61.     Jones responded to this reporting via email acknowledging the report and promising that he would take action.

62.     After this bullying and these assaults were reported no action was taken by the GMSS administrators or the coaching staff to punish or discipline the students that assaulted, bullied, and harassed BZ and no action was taken to end or prevent the harassment.

63.     Assistant Principal Jones specifically called John Zimny, after the September 3, 2021 incident, to tell him that Jones had decided to believe the students who assaulted BZ when they told him they were not doing anything wrong and therefore was not going to do anything

about these reported incidents or take any action on behalf of BZ, the student with disabilities who told him what happened.

64.     As a result of the failure to take corrective or disciplinary action the football team related harassment continued for BZ.

65.     The unfairness in the "non-handling" of these additional complaints and the GMSS administrators and the coaching staff's failure to take BZ's complaints seriously, once again, came across very clearly, to BZ and his parents.

66.     BZ may have only been 12 years old in the Fall of 2021, but he is and was at that time an intelligent young boy with a child's innate sense of fairness.

## Lunchtime Assault

67.     On September 14, 2021, a female GMSS student, that BZ did not know came up to him at recess during lunchtime at GMSS and threw a bag full of Doritos in his face. She then threw the Dorito bag in his face.

68.     BZ's parents reported this assault event to Assistant Principal Jones, the then Assistant Principal of GMSS.

69.     In addition, BZ told Assistant Principal Jones that he was the one who was assaulted by this female student.

70.     The result of reporting this physical assault on BZ to Jones resulted in BZ getting an in-school detention, while the female student that initiated the assault received **no** punishment.

71.     Mr. Jones told John Zimny, BZ's father, that he would review the video from the lunchtime assault, but Assistant Principal Jones then told John Zimny he could not share any video information.

72.     The District 304 personnel gave BZ, the *victim*, a punishment, while the *perpetrator and instigator,* the GMSS female student, a regular education student without disabilities, received no reprimands or any punishment.

73.     This action by District 304 personnel was a clear violation of the District 304 Code of Conduct / Bullying Policy.

74.     This punishment confirmed, again, BZ's growing understanding that he was not being treated fairly and he was now learning that the D304 personnel were not only NOT keeping him safe, but were outright ignoring him and blatantly treating him unfairly and discriminating against him in favor of other students including regular education students.

**Lunchtime Conversation Incident**

75.     On October 1, 2021, Lindsay Zimny received a call from then Principal Bleau.

76.     At the start of the phone call Principal Bleau asked that BZ be included, and the family agreed and made sure BZ was on the call and that he could hear all that was said by all call participants.

77.     From the beginning of the call Principal Bleau's tone and his words were accusatory toward BZ, negative in tone and derogatory toward BZ.

78.     At the time of the October 1, 2021 phone call from Principal Bleau, John Zimny was in the family car, as were the rest of the Zimny family and BZ's grandparents. All of them

could hear all parts of the call and John Zimny told Bleau that all persons in the car could hear the call.

79.     During the October 1, 2021 call Principal Bleau told the family that BZ and some regular education GMSS students—boys—were playing with a basketball on the playground at lunchtime. Bleau said that one of the boys told him that BZ said he was going to come to the boy's house to shoot him with his AK.

80.     Bleau did not describe any investigation or other effort to determine what actually happened and was both negative, accusatory and derogatory towards BZ and communicated by his words and tone that he considered BZ guilty.

81.     BZ and his family members, who all heard the call, saw that it was clear to Bleau that BZ was already determined to be guilty without Bleau or other District 304 personnel talking to BZ, conducting any investigation and making no efforts to determine what really happened. BZ and his family were very upset about this.

82.     BZ denied the accusations.

83.     Once again BZ received, what he and his family members describe as yet another "gut punch" from District 304 personnel which made it clear to BZ that the District 304 personnel were, once again, not only NOT keeping him safe but were outright ignoring him, deciding he was guilty of things he never did without any investigation and continuing to blatantly treat him unfairly in favor of regular education students.

84.     During the Friday, October 1, 2021 phone call initiated by Principal Bleau, Principal Bleau told John Zimny that Bleau wanted John Zimny to come to a meeting first thing

in the morning on Monday, October 4, 2021. Bleau would not tell John Zimny what the meeting was going to be about.

85.     John Zimny and BZ both went to the GMSS office on October 4, 2021 for the meeting Mr. Bleau called.

86.     Upon arrival, John Zimny and BZ were told without any discussion or questioning of BZ that Mr. Bleau had already decided BZ was guilty and was imposing an In-School Suspension on BZ—"as a start"—for the incident that was the subject of the October 1, 2021 telephone call from Bleau.

87.     This action by Bleau and the District 304 personnel was determined prior to the Threat Assessment Team meeting that District 304 policy mandates was supposed to take place in situations like this and prior to any questioning of BZ about what the other regular education student told Bleau that BZ had said or about what, if anything, BZ had actually said.

88.     BZ and John Zimny attempted to ask questions and tell Bleau that BZ did not do what Bleau concluded BZ did, but Bleau would not allow it, nor would he discuss the fact that no real investigation had been done by Bleau or GMSS personnel.

89.     On the same day, October 4, 2021 at approximately 2:30 p.m., John Zimny was again called by Bleau and told that he had to come to another meeting at the end of the school day and that BZ would also be at this second meeting.

90.     At this second meeting, John Zimny was told in the presence of his son, that BZ was receiving a **second** In-School Suspension to be served on another day for this same event

that was the subject of the first meeting on October 4, 2021 and the October 1, 2021 telephone call.

91.     At this second meeting, Bleau asked BZ a series of questions that were essentially the same question just asked in a different way. BZ could not process the onslaught of questions because of his disabilities but eventually realized that Bleau was trying to manipulate him into saying something had happened that BZ knew did not happen.

92.     At this second meeting, Mr. Zimny asked Mr. Bleau if any investigation had taken place and if the same punishments were given to "normal" kids compared to those with special needs—before an investigation was complete and Bleau replied that he could not answer the question about the treatment of special education students vs. regular students.

93.     Mr. Zimny then expressed that the bullying and the unfair treatment of BZ that occurred starting with the August 2021 incident and as more fully set forth herein must come to an end.

94.     After John Zimny made this statement, Mr. Bleau stood up, kicked his chair, and slammed his hands on the table that separated Bleau from the Zimny's, leaned forward and began yelling at Mr. Zimny and BZ about the bullying comments.

95.     This abrupt, frightening and completely unprofessional blow up by Bleau frightened BZ, made him even more fearful of Bleau and made it even more clear to him that the District 304 personnel he was supposed to trust and rely on disliked and disrespected him and his family and would not even listen to what he or his family had to say.

96.     Mr. Zimny then took BZ and left, because he could see that this behavior including the screaming and yelling by Bleau was not only inappropriate in front of BZ but damaging to him.

97.     The result of this accusatory incident was that BZ served two In-School Suspensions, NOT on consecutive days for an issue for which there was no clear proof and when no real investigation had taken place before punishments were administered to BZ.

98.     John Zimny continued to insist that GMSS undertake an investigation into this incident.

99.     Ultimately an investigation took place, but it was after BZ served the two in-school suspensions.

100.    Assistant Principal Jones called the family to tell them that after investigating this matter it was determined there was ***no proof*** that BZ had made the statements. Rather it was determined that another GMSS student, a boy who was a regular education student without disabilities, had made the comments, not BZ.

101.    No other students received any punishments as a result of this incident, only BZ.

102.     After this investigation was completed, no apologies were ever made to BZ or John Zimny by GMSS personnel, Bleau or any other persons.

103.    Once again, District 304 personnel made it clear to BZ and his father that the District 304 personnel were not only NOT keeping him safe but were outright ignoring him, continuing to blatantly treat him unfairly and outright discriminate against him in favor of other students including regular education students without disabilities.

**BZ's Mother's Stroke**

104.    October 5, 2021, BZ's mother, Lindsay Zimny, had a stroke. She went to the Urgent Care because it was close and the ER had a six hour wait and her doctors concluded it was stress induced.

105.    After consulting with her doctors Lindsay Zimny and her doctors concluded that the bullying that BZ was enduring with no help from the administration of District 304 or GMSS to stop it or control it and the active unfair treatment of BZ by District 304 as set forth more fully herein was the source of her stress and simply too much for her.

106.    Follow up testing by Lindsay Zimny with her cardiologist, neurologist, and general practitioner all confirmed that the stress brought on from the actions and non-actions of the District 304 personnel was the reason for the stroke.

107.    BZ was very upset about his mother and knew the stroke and her medical treatment was because of the unfair and discriminatory treatment he had received at the hands of District 304 personnel, all as described more fully herein.

**Denial of Request for a Hearing**

108.    In October 2021, after the October 6, 2021 In-School Suspension described above – BZ's parents filed a UGP (Uniform Grievance Procedure) and asked for a hearing before the District 304 board concerning the incident that was the subject of the October 1, 2021 telephone call described above and resulting pre-investigation suspensions levied on BZ. Among other things the family was seeking clarification about the supposed in-school "detention / suspension", how long this "detention / suspension" was and whether BZ received proper services / supports.

And, whether what BZ was required to do was actually a suspension and if any other students, including the regular education student who was found to be at fault, received any punishments.

109.     The request for a meeting / hearing before the Board was denied. This denial was contrary to the school's suspension procedures because it was levied on BZ before any real investigation and also contrary to District 304 policy and custom and practice.

110.     Illinois law specifically provides for the following: **105 ILCS 5 / 10-22.6. Suspension or expulsion of pupils; school searches**. Any suspension shall be reported immediately to the parents or guardian of a pupil along with a full statement of the reasons for such suspension and a notice of their right to a review. The school board must be given a summary of the notice, including the reason for the suspension and the suspension length. Upon request of the parents or guardian, the school board or a hearing officer appointed by it shall review such action of the superintendent or principal, assistant principal, or dean of students. At such review, the parents or guardian of the pupil may appear and discuss the suspension with the board or its hearing officer.

### Defacement of BZ's Locker

111.     On October 29, 2021, a GMSS student targeted BZ by drawing a penis on his locker, which was in a main hallway where most of his classrooms were located. BZ was upset and scared by this incident especially since he did not know who did it and as a result this incident was humiliating and frightening to BZ.

112.     This locker incident was a clear violation of the District 304 Code of Conduct / Bullying Policy.

113.    BZ and his parents reported this incident to Assistant Principal Jones, with copies of their emails also sent to Superintendent Mutchler and Ann Scalia.

114.    Jones advised the Zimnys that he would immediately review all video to investigate this.

115.    Assistant Principal Jones did not advise BZ or the Zimny's of the results of his video review and investigation despite several requests from the Zimny's for him to do so.

116.    On information and belief no action was taken against any GMSS student for this locker incident.

117.    Three school days after the drawing appeared on BZ's locker it was finally washed off by a custodian.

118.    Once again, BZ saw that the District 304 personnel were not following the District 304 policy and were dismissing as invalid another one of his and his family's concerns about BZ, his safety and the unfair treatment he was receiving.

## First Assault of BZ in PE Class

119.    On November 19, 2021, BZ was assaulted in PE class during a floor hockey game that was going on as part of the class.

120.    A much larger boy in the class and a former football teammate of BZ's kept running into BZ on purpose which BZ tried to ignore and avoid.

121.    This boy had verbally harassed BZ back in August 2021 when they played on the football team, bullying and mocking BZ by saying he was no good, and made fun of the way he runs.

122. The way BZ runs are characteristic of BZ's gross motor problems that are part of and which are one of his disabilities.

123. BZ and the Zimny family had reported this boy's bullying of BZ back in August 2021 when they reported the football team harassment of BZ.

124. The District 304 personnel knew that this boy had previously harassed and bullied BZ.

125. The boy, a regular education student with no disabilities and who was much bigger physically than BZ, further harassed and bullied BZ in the PE class hockey game on or about November 19, 2021.

126. The boy hit BZ in the shin with a hockey stick at close range, with what appeared to BZ was a hit using all the boy's strength, resulting in a large bruise to BZ's shin area.

127. These actions by the other boy in the PE class were a clear violation of the District 304 Code of Conduct / Bullying Policies.

128. BZ went to the school nurse who contacted his parents.

129. BZ's parents determined that BZ needed to see a doctor and when he did, the doctor examined him and determined he needed x-rays to be sure nothing was broken.

130. Assistant Principal Jones came into the nurse's office while BZ was there being treated and began asking BZ multiple questions in a rapid manner.

131. Because of his disabilities and the threatening manner of questioning employed by Jones, BZ became very anxious and was not able to process this type of questioning and asked that he be allowed to leave and contact his father and to be able to answer the questions later.

132. Jones told BZ, the victim of the assault, that he could not leave and could not contact his father.

133. After examining BZ the doctor told the family that this was a very sensitive area on the leg and that BZ had a deep tissue bruise. BZ was told he would have to be off his feet for 7 to 10 days to rest his leg. The bruise was about three inches long and two inches wide. The bruising was deep purple and spread further over the next few days.

134. This leg injury was a very painful injury for BZ.

135. BZ and his parents called Jones two times to report the incident but Jones never answered the calls and they called the school nurse three times to get through to someone but she never answered those calls. Finally, when Jones eventually called the Zimny's back they reported the incident to Jones.

136. Assistant Principal Jones called John Zimny on or about November 19, 2021 after the school day was over and John Zimny learned that no investigation was completed into this incident.

137. Assistant Principal Jones told John Zimny that the injury happened because BZ was not playing the game correctly. BZ and his father disputed this statement when it was made.

138. Later, John Zimny talked with Jones who told him that the injury was the fault of the other boy and that BZ had in fact been playing the game correctly and was not at fault.

139.     The student ultimately admitted to the PE game assault on BZ with a hockey stick and informed Mr. Jones that it was retaliation.

140.     The student who assaulted BZ with a hockey stick was given a *one-day* In-School Suspension and was still allowed to participate in after school sponsored sports.

141.     BZ was very upset by this since he had received *two days* of In School Suspension and was *not* allowed to participate in any after school sports for a lunchtime conversation incident where no one was harmed, and it was determined he was not at fault.

142.     BZ saw that this was just another in a long line of incidents where he was treated unfairly, despite being the victim, and treated differently that regular education students because of his disabilities. BZ saw this as another example of unequal and discriminatory punishment.

143.     BZ is a special needs student and the boy who physically harmed BZ in the PE class with a hockey stick used as a weapon is a regular education student.

144.     Again, the unfair treatment, un-equal punishment, and lack of concern for BZ demonstrated by the actions and non-actions of the District 304 personnel were very apparent to BZ and his family.

145.     The Geneva, Illinois police conducted an investigation into this assault and bullying incident and determined the attacker was at fault and should be charged with Battery.

**Assistant Principal's Refusal to Allow BZ to Call His Father**

146.     BZ was out of school for a week or so following the hockey stick assault in PE class pursuant to the advice of his doctor and his fear of going back and being assaulted again.

147.     On or about November 29, 2021, BZ's first day back in school after the hockey stick assault and injury, he was called to the office for questioning by Jones and then the Dean of Students, Kristin Oros. He was not told why he was being called into the office.

148.     At that time, BZ was frightened and his anxiety increased significantly because of his disabilities and his prior experience with Jones in the nurse's office after the PE hockey stick assault injury.

149.     BZ told Jones and Oros that he did not feel safe and asked that he be able to contact his father.

150.     Jones refused both requests and raised his voice and yelled at BZ telling him that he could not leave, he "was going to listen to him [Jones]" and hear and respond to what Jones had to say.

151.     These actions by Jones significantly increased BZ's anxiety and fear for his own safety. He again asked if he could leave, and Jones again told him no "he was not going anywhere". This only further increased BZ's fear and anxiety.

152.     BZ then learned that he was being questioned about an incident where someone threw a folded paper item at a classmate named Mila. BZ eventually learned that Jones was trying to learn if Brenan saw anyone throw this folded paper item at Mila.

153.     BZ saw this unfair and fear and anxiety inducing incident as yet another incident where he was singled out, his disabilities were ignored, his simple request to call his father was refused and he was subjected to fear and anxiety inducing treatment this time at the hands of District 304 personnel rather than his fellow students.

154.     These realizations only caused his fear and anxiety and his fear that he could not be safe at GMSS to increase causing him further damage and injury.

### Second Assault of BZ in PE Class

155.     On or about December 14, 2021, BZ was participating in a teacher mandated event in PE class where the students participated in and played games that the students had made up and created.

156.     During this game playing class, the PE teacher Ryan Barabaz was present.

157.     BZ was holding a dodge ball type ball, as required by the student created game they were playing when another student participant hit and shoved Brenan, a behavior that was not part of the student created game.

158.     When his family heard about this incident John Zimny talked with the PE teacher Ryan Barabaz, who was also one of BZ's GMSS football team coaches, who told John that BZ was at fault but during the conversation admitted that he did not talk to BZ to find out what actually happened.

159.     Barabaz, an employee of District 304 allowed BZ, a special needs boy to be assaulted by a classmate and then he blamed BZ, the special needs boy, for the incident without even talking to BZ.

160.     BZ and his family saw this as more of the ongoing the mistreatment and disregard for BZ by District 304 personnel reaching a level where his teachers and other school personnel, were not only disbelieving and discriminating against him but were now allowing him to be hit and shoved in school and then blamed for the incident even though BZ was behaving properly and was not at fault.

161.    BZ's fear for his own safety and the resulting anxiety became even higher than it already was, and he and his family concluded that they could no longer trust District 304 personnel to keep their special needs son safe at GMSS.

## DEFENDANT'S CHILD FIND RESPONSIBILITIES

162.    Illinois school districts including District 304 have what is called a Child Find duty which requires them to know or be reasonably expected to know of a child in their District and in their schools that has BZ's disabilities and pursuant to their Child Find duty they are then required to evaluate them, provide supports and to not discriminate against such a child.

163.    Prior to August 2021, BZ had not been disciplined in school and he had not complained of bullying.

164.    During the months of bullying that BZ endured as more fully described herein and the reports and complaints made by BZ and his parents no one in GMSS identified BZ as a student with disabilities that needed intervention and supports.

165.    During that same time no one at GMSS identified BZ pursuant to the District's Child Find duty.

## DEFENDANT'S FAILURE TO PRESENT AND PROVIDE A SAFETY PLAN

166.    A Safety Plan for an individual student in an Illinois school is a plan prepared by the school district personnel and is designed to provide special supervision and support to individual students for their safety.

167.    At all times relevant Defendants knew what a Safety Plan was and were aware of their responsibilities regarding identifying students such as BZ who would need and benefit from such a Safety Plan.

168.    On information and belief, the Defendants have prepared and put in place Safety Plans for other District 304 students prior to August 2021.

169.    On information and belief these prior Safety Plans were prepared and initiated by the District 304 personnel after receiving a request from the student or the student's parents or after being aware of reasons that a Safety Plan would help the student.

170.    Starting on or about October 5, 2021, BZ's parents started asking the administrators at GMSS and other District 304 personnel to prepare and present a Safety Plan for BZ because all of the bullying, the unfair and discriminatory punishments levied on BZ, and the intimidating and explosive interactions BZ and his family had with GMSS personnel as more fully set forth herein had made BZ fearful of going to school and made him feel unsafe in school and unsafe with GMSS personnel.

171.    BZ's parents put their requests and the reasons for their requests for a Safety Plan for Brenan in writing and made these written requests approximately 37 separate times over two plus months.

172.    The written requests were sent to the following District 304 and GMSS individuals, Superintendent Mutchler, Anne Scalia, Assistant Principal Daniel Jones, and Principal Terry Bleau.

173.    The District and the recipients of the family's approximately 37 separate written requests repeatedly ignored the family's and BZ's requests for a Safety Plan and failed to propose or draft a substantive Safety Plan.

174.    Months later, on or about January 7,2022, an inadequate Safety Plan was finally proposed by the District.

175.    The Safety Plan proposed by the District was months late, was delayed during a time when BZ was being harmed and, specifically ignored the key items that would both keep BZ safe and more importantly help him "feel" safe. These key items had been sent to the District, in writing, by the Zimny's well before the District submitted its first, and inadequate Safety Plan.

176.    The proposed Safety Plan written by the District 304 personnel did not pursue any school-based supports for BZ such as case study evaluation, social work services, or any other school supports provided to other regular education or special education children in the district.

177.    The proposed Safety Plan was very focused on keeping BZ's father, John Zimny, from being physically present in the school building despite their knowledge that BZ requested that his father be allowed to be present and BZ's statements that having his father present would make him feel safe should BZ have to be questioned or have to meet with school personnel about any bullying issues or any other behavioral or other issues involving BZ.

178.    At all times BZ was aware, and the Zimny family told the Defendants that BZ knew, that the Defendants were not responding to his family's approximately 37 written requests for a Safety Plan.

179.    BZ's family proposed changes to the inadequate Safety Plan proposed by the District so that it would actually help BZ, but those changes were ignored and not implemented or made a part of the draft Safety Plan that went back and forth between the District and the Zimny family.

180. The Zimny's asked the District to modify the proposed Safety Plan to include a provision that BZ not be called to the office without Mr. Zimny being present because previously when called to the office, BZ's needs as a Special Education Student with disabilities and a student with autism, were ignored when BZ was in the office talking with or being questioned by GMSS personnel.

181. One of the primary reasons for the family's requested changes were that during these prior meeting and questioning sessions appropriate strategies for discussion with or questioning of an autistic child were not applied or used by GMSS personnel and as a result BZ felt threatened and unsafe with the GMSS administrators.

182. The October 4, 2021 meeting where Bleau yelled at BZd and his father, the November 19, 2021 incident in the nurses office after BZ was assaulted in PE class with a hockey stick and the November 29, 2021 incident where he was called to the office to meet with Jones and Oros about an incident that did not even involve him are examples of this traumatic and abusive treatment of BZ, at the hands of District 304 personnel, and in particular the November 29, 2021 incident where he was held in the office against his will.

183. The District's proposed Safety Plan was primarily designed to keep BZ's father, John Zimny, from being allowed to come to the school in the event that BZ was called to the office and to not allow John Zimny from being physically present with BZ for any meeting with GMSS personnel rather than to help BZ be and feel safe.

## DEFENDANT'S TRUANCY REPORTING AND TRUANCY THREATS TO BZ AND HIS FAMILY

184. On or about December 14, 2021, BZ became so anxious and fearful of going to school at GMSS as a direct and proximate result of the unfair treatment, un-equal punishment,

failure to take his complaints, concerns and statements seriously and lack of concern for BZ demonstrated by the actions and non-actions of the District 304 personnel as set forth herein that he did not want to go to GMSS because he feared he would not be safe and that the District 304 and GMSS personnel would not protect him.

185. BZ's anxiety and fear for his safety from attending GMSS and the repeated failure of the District 304 personnel to provide a Safety Plan for BZ caused his parents to keep him home from school to keep him safe and in an attempt to mitigate the physical and psychological damage done to BZ as a result of the actions and non-actions of the District 304 personnel as set forth herein.

186. On or about February 16, 2022 the Defendants started threatening BZ and his family with truancy reporting because BZ was not in school despite the fact that BZ and his family had—and the district *knew* they had—letters from medical professionals who were providing treatment to BZ stating that he needed to be out of school.

187. After receiving these truancy reporting threats BZ's family contacted and talked with the truancy people at the Illinois Regional Office of Education (ROE) checked with the ROE and found out that what the Defendants were doing was not a proper use of the concept of truancy nor did BZ's situation even fit the definition of truancy and that it was Assistant Principal Jones who had called the ROE to report BZ.

188. During this time the District 304 personnel were marking BZ as unexcused for his absences despite knowing that BZ was not truant and that the family had provided letters from medical professionals who providing treatment to BZ stating that he needed to be out of school.

189. At all times relevant herein the District personnel knew that their threats of truancy reporting against BZ and his family was not a proper use of the concept of truancy, did not comply with the applicable truancy laws and that BZ's situation did not even fit the definition of truancy.

190. At all times BZ was aware, and the Zimny family told the Defendants that BZ knew, that the District was threatening truancy reporting and that BZ's situation did not fit the definition of truancy.

## BZ AND ZIMNY FAMILY'S ADDITIONAL EFFORTS TO HELP BZ BE AND FEEL SAFE IN SCHOOL
### BZ's Parents' Requests for 504 Meeting

191. BZ's parents requested a domain for a re-evaluation to request more supports for BZ and the meeting was held on or about November 11, 2021.

192. A domain meeting is a meeting to request an evaluation and more supports for the student. At this domain meeting, the school-based team had NO concerns for BZ and did not feel an evaluation was warranted despite the documented bullying, the complaints and treatment all involving BZ and with all the issues that had already occurred in the school setting, and which were known to Defendants.

193. BZ's parents provided medical information to support their request, and their request for supports and accommodations to both help BZ and to help him be and feel safe at school.

194. The District personnel unilaterally decided that an evaluation was not warranted despite information from the parents and medical information to the contrary.

**BZ's Parents' Requests to be Notified**

195.    Beginning in August 2021, BZ's parents asked that they be notified and provided written notifications if BZ is involved in any incidents in school. In addition, Illinois law and District 304 policy required such notifications.

196.    BZ's parents received no such notifications.

197.    On or about October 5, 2021, BZ's parents filed a UGP and requested a hearing so they could address the Suspensions that were handed out to BZ in October 2021 before an investigation was completed for that incident and where BZ was found not to be at fault when an investigation was finally undertaken.

**BZ'S WORSENING HEALTH AND MEDICAL CONDITION
AND REQUEST FOR DISTRICT 304 TO APPROVE
HOMEBOUND INSTRUCTION FOR BZ**

198.    In February 2022, BZ's parents became concerned about BZ's worsening physical and mental health as a result of the increased anxiety and fear and the physical and behavior changes and symptoms BZ was exhibiting caused by the unfair treatment, un-equal punishment, and lack of concern for BZ demonstrated by the actions and non-actions of the District 304 personnel all as set forth herein.

199.    His parents took BZ to medical doctors and then to a qualified outside therapist who recommended homebound instruction for BZ due to "severe anxiety and emotional outbursts secondary to events that occurred at school."

200.    BZ's family then decided to request homebound schooling status for BZ.

201.    BZ's family followed proper procedure for a homebound schooling status request for BZ and made multiple such requests.

202.     With each request for homebound schooling status for BZ, BZ's parents provided clear documentation of the need for the request and signed letters from licensed medical care providers to support the requests.

203.     On two separate occasions, the District refused to accept the homebound schooling requests and has never approved the homebound schooling status despite numerous follow up and requests by BZ's parents nor did the District 304 personnel address the medical reasons for the family's requests.

204.     At all times, BZ was aware, and the Zimny family told the Defendants that BZ knew, that the Defendants were denying his requests for Homebound Schooling status.

## THE ONLINE CALENDAR

205.     After refusing to approve homebound schooling status for BZ the District 304 team at GMSS that were responsible for BZ determined that they would provide BZ an online calendar of daily assignments, the stated purpose of which was to help him further his education while physically out of school.

206.     The District 304 team did not seek or try to obtain input from BZ or involve BZ or his parents in this online calendar process.

207.     This online calendar was not consistently filled in by teachers, did not always have all the information it should have had and was changed routinely and without notice to BZ.

208.     At all times the District's teachers and administrators knew that changes in routine are particularly difficult for BZ as an autistic child and as a child with the disabilities they knew he had.

209.     These failures not only confused BZ and made his efforts to do his work harder, but it was also more proof to him and his family that the District 304 staff, and administration did not care about him at all.

210.     During this time the district personnel did not allow BZ access to online classroom platforms / supports that were available to all students or consistently provide him access to the 7th grade curriculum.

211.     During the week of March 21, 2022 BZ was having additional difficulties accessing his assignments and using the online calendar.

212.     He reached out via email to his teachers for help with the difficulties he was having accessing his assignments and using the online calendar but none of them responded to BZ's emails requesting help.

213.     BZ's family took screen shots establishing the various problems with the online calendar and the staff's failures to place assignments on the calendar system while they were placing such assignments for the benefit of other GMSS students both regular education and special education students.

214.     On March 8, 2022, during a video check-in with BZ, Mrs. Shelly Rolf, BZ's special education person talked about a meeting she attended wherein it was said that BZ should be in an outpatient treatment center.

215.     BZ had never heard about such a program or that he was someone who should attend such a program and upon hearing it he was immediately both terrified and anxious since it

was described as something far different from regular school. Further, this statement was made when Shelly Rolf knew that BZ was on the call and caused Brenan to have a severe anxiety attack.

216.     On or about October 21, 2021, BZ's family scheduled and took BZ for an outside neurological exam in an effort to obtain further proof for the Defendants that BZ needed help and supports.

217.     After an outside neurological was completed, the family again requested a domain meeting and engaged with the district many times in an attempt to schedule the meeting.

218.     The district continually refused to work with John Zimny to find a mutual date that worked for **ALL** involved, despite Mr. Zimny's repeated attempts at explaining he needed at least two weeks to find a few dates that his employer would be agreeable to.

219.     John Zimny's needs to be able to schedule around his employer's needs was repeatedly ignored by the Defendants and District 304 personnel.

220.     The District personnel did send out self-serving emails with dates they knew were unworkable for Mr. Zimny and the family.

221.     The District personnel never agreed upon a date with the family, did not provide a notification of conference, or give them the 10-day notice prior to the meeting all as required by state law.

### DISTRICT 304'S ARBITRARY REFUSAL TO CONTINUE TO PROVIDE AN EDUCATION TO BZ

222.     On or about March 16, 2022, the Defendants had their attorney advise the Zimny family and BZ that the District would continue the online calendar up to March 25, 2022 and that

on March 24, 2022 the District would discontinue any and all further instruction / educational services for BZ.

223.     The Defendants did not give BZ or his family any substantive reasons for this arbitrary cut off of all educational services to a disabled student who lived in the School District and was entitled to free accessible public-school education (FAPE).

224.     At this time and at all relevant times the District was providing a free accessible public school education to all other students in the District both regular education students without disabilities and special education students with disabilities and had provided online education services to regular education and special education students during the Covid lockdowns.

225.     This arbitrary cutoff of educational services by the Defendants and District 304 was directly contrary to Illinois law requiring an Illinois School District to provide a free accessible public-school education (FAPE) to all students in the District, including BZ.

226.     At the time the Defendants and District 304 was cutting off all educational services to BZ the Defendant and District 304 was regularly providing a free accessible public-school education (FAPE) to all students in the District both regular education and special education students.

227.     All during this time BZ was having severe emotional distress, PTSD and anxiety attacks accompanied by physical symptoms such as stomach aches, headaches, vomiting, chest pains, emotional outbursts, excessive handwashing to the extent that skin was coming off his hands and other physical problems.

228.     The District personnel denied and prevented BZ's parents requested review hearing regarding this arbitrary cut-off of educational serviced to a special needs student such as BZ from taking place.

229.     As a direct and proximate result of all of these bullying incidents where BZ was the victim and the failures of the District 304 personnel to act fairly toward BZ, BZ became increasingly afraid to go to school, suffered from severe anxiety, and had repeated and ongoing bouts of physical symptoms including, but not limited to, stomachaches, headaches, vomiting, chest pains, emotional outbursts, excessive handwashing to the extent that skin was coming off his hands and other physical problems caused by anxiety, stress, and fear.

230.     Notwithstanding District 304's obligations under the Rehabilitation Act, the Defendants engaged in a practice of allowing a student with disabilities, such as BZ, to be subject to continued and ongoing harassment, unwanted negative attention and unfair and unequal discipline.

231.     District 304 failed to provide BZ, a person with disabilities, the same access, use and enjoyment of education as other students, because of BZ's disabilities. This unequal treatment occurred because, among other things, Defendants allowed BZ to be subject of continued and ongoing harassment, unwanted attention, and unfair and unequal discipline based on his disabilities and failed to protect BZ from harassment, discrimination and a hostile environment.

## COUNT 1

### John Zimny as Legal Guardian of BZ Zimny;
### Violation of the Rehabilitation Act, 29 U.S.C. § 794a

1-231.   Plaintiff incorporates by reference paragraphs 1 through 231 from the first part of this complaint beginning on page 1 of this Complaint as if fully set forth herein.

232.   At all times relevant, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701 et sequitur, and its implementing regulations, 49 C.F.R. § 27.7. Congress enacted the Rehabilitation Act forty-six years ago as a comprehensive federal program to "empower individuals with disabilities to maximize . . . independence, and inclusion and integration into society, through . . . the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1)(F).[1] To effectuate these purposes, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Section 504 seeks "not only to curb 'conduct fueled by discriminatory animus,' but also to right 'the result of apathetic attitudes rather than affirmative animus.'" *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152 (10th Cir. 1999) (quoting *Alexander v. Choate*, 469 U.S. 287, 296 (1985)); *see also* 28 C.F.R. § 41.51(b)(3) (Justice Department's Section 504 coordination

---

[1] Congress found that "disability is a natural part of the human experience and in no way diminishes the right of individuals to . . . contribute to society; pursue meaningful careers; and enjoy full inclusion and integration in the . . . economic . . . and educational mainstream of American society." 29 U.S.C. § 701(a)(3). Nonetheless, Congress found that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . education." 29 U.S.C. § 701(a)(5).

regulation prohibiting criteria or methods of administration that have the purpose *or effect* of discriminating). Section 504's implementing regulations provide in pertinent part as follows:

A. An individual with a disability is "otherwise qualified" to participate in covered programs and activities if that individual "meets the essential eligibility requirements for the receipt of such services." 49 C.F.R. § 27.5.

B. "A recipient, in providing any aid, benefit or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability: (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service; …(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefits, … as persons who are not handicapped; … (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit or service. 49 C.F.R. § 27.7(b).

233. Under Section 504 of the Rehabilitation Act, disability harassment is any intimidation or abusive behavior toward a student based on a disability that creates a hostile environment by interfering with the student's participation in benefit, services, or opportunities in the institutions programs (U.S. Department of Education policy guidance, 2000 and 2010). A school must take immediate and appropriate action to investigate or otherwise determine what occurred upon knowing of the harassment. The obligation is triggered when a responsible employee either knew or in the exercise of reasonable care should have known about the harassment.

234. At all relevant times herein, Defendants knew BZ had federally protected rights to be protected from harassment and intimidation based on his disability, and Defendants' acts and omissions alleged herein violated and continue to violate the Rehabilitation Act and its implementing regulations in one or more or the following manners:

A. Defendant has, by reason of disability, discriminated against BZ by engaging in a practice of allowing a student with disabilities, such as BZ, to be subject to continued and ongoing harassment, unwanted negative attention and unfair and unequal discipline

while not questioning or disciplining other students without disabilities who were involved, in violation of Section 504's broad nondiscrimination mandates, 29 U.S.C. § 794(a).

B. Defendant has, by reason of disability, discriminated against BZ by engaging in a practice of allowing a student with disabilities, such as BZ, to be subject to continued and ongoing harassment, unwanted negative attention and unfair and unequal discipline for purported behavior which is consistent with his disability and not otherwise the basis for discipline, in violation of Section 504's broad nondiscrimination mandates, 29 U.S.C. § 794(a).

C. Defendant has, by reason of disability, discriminated against BZ by allowing him to be subjected to harassment, intimidation, and abusive behavior by administration, and other students in violation of Section 504's broad nondiscrimination mandates, 29 U.S.C. § 794(a).

D. Consistent with its practice of disproportionately disciplining BZ a student with disabilities, Defendants have, by reason of disability, discriminated against BZ by imposing discipline on him while failing to discipline other students without disabilities engaging in the same behavior and by imposing disciplinary measures not reasonably related to the alleged offense.

E. Defendants acted intentionally and with deliberate indifference and knew or should have known that they had not provided the benefit of its services to BZ.

235.    Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) et sequitur] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. Barnes v. Gorman, 536 U.S. 181 (2002).

236.    Defendant's conduct has inflicted injury and damages upon BZ, including loss of civil rights, physical injuries and sickness, as set forth herein, loss of the opportunity to attend Geneva Middle School South and participate in the extracurricular and social events provided by the school.

237.    Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

WHEREFORE, Plaintiff prays for the following relief:

A.  An award of compensatory monetary damages.

B.  An award of attorneys' fees and costs.

C.  Such other relief as the Court deems just.

## COUNT II

## Violations of Title II of the Americans with Disabilities Act,
## 42 U.S.C. §§ 12101 to 12189

1-231.  Plaintiff incorporates by reference paragraphs 1 through 231 from the first part of this complaint beginning on page 1 of this Complaint, as if fully set forth herein.

232.    Plaintiff's claims in Count II arise under the ADA, 42 U.S.C. §§ 12101 – 12189 (the "ADA"), and its implementing regulation under Title II, 28 C.F.R. Part 35. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. See also 28 C.F.R. § 35.130(a).

233.    The acts and omissions of Defendant set forth herein violated the ADA and its implementing regulations in one or more or all the following manners, as Defendant has discriminated against Plaintiff by:

A.  Denying him the opportunity for the full and equal enjoyment of Defendant's services, programs, and activities.

B.  Denying him the opportunity to participate in or benefit from Defendant's services, programs, and activities.

C.  Offering or affording him services that are not equal to those services afforded to other individuals who do not have disabilities.

D.  Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford Defendant's services, programs, and activities to Plaintiff.

E. Failing to provide a Safety Plan despite knowing that BZ had been a repeated victim of bullying and had suffered physical injuries from the bullying and that BZ and his family had been requesting one for over two months.

F. Telling BZ that Defendant would no longer provide any educational services to BZ on or about March 25, 2022 well before the academic year was over for the 2021-2022 school year and following through on that arbitrary decision.

G. Reporting BZ as truant from school when Defendant knew that BZ was out of school on advice of his medical doctors and medical treating professional.

H. Reporting BZ as truant from school when Defendant knew that BZ's situation did not fit the definition of truancy and that BZ was, in fact, not truant from school.

I. Failing to fulfill Defendant's Child Find responsibilities as set forth herein.

J. Failing to properly train the District 304 and GMSS personnel in dealing with, talking with, and disciplining students with special needs students and in particular students with the disabilities BZ had.

K. Acting intentionally and with deliberate indifference in repeatedly requiring BZ to respond to purported disciplinary infractions which were in fact based on BZ's disability and the actions of other students without disabilities; in questioning BZ who has autism and anxiety disorder, based on his disability, without his father's knowledge or consent; in questioning or conducting disciplinary actions and unfair and discriminatory discipline based on BZ's disability without his father's knowledge or consent.

L. Allowing bullying and harassment of BZ by GMSS students as set forth herein which created an abusive educational environment effectively denying BZ the opportunity to attend school or participate in the extracurricular and social events provided by the school without fear of discrimination, harassment and bullying.

M. Allowing bullying and harassment of BZ by GMSS staff as set forth herein which created an abusive educational environment effectively denying BZ the opportunity to attend school or participate in the extracurricular and social events provided by the school without fear of discrimination, harassment, and bullying.

N. Failing to correct or issue a statement or take other actions to exonerate Plaintiff as a potential shooter or user of firearms, a label GMSS staff effectively placed on Plaintiff as a result of their failure to investigate and determining fault before punishing BZ publicly with two in-school suspension days and repeatedly singling him out as on the basis of his autistic behavior and allowing such labeling to continue for almost one academic year.

O. Otherwise having discriminated against Plaintiff because of his disability.

234. As a direct and proximate result of its violations of the ADA, Defendant has

inflicted injury and damages upon the Plaintiff, including loss of a civil right, mental anguish,

humiliation, and mental pain and suffering, and loss of the opportunity to attend GMSS and participate in the extracurricular and social events provided by the school.

235.    Plaintiff is entitled to compensatory damages and reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 12205.

WHEREFORE, Plaintiff prays for the following relief:

A.  An award of compensatory monetary damages.

B.  An award of attorneys' fees and costs.

C.  Such other relief as the Court deems just.

## <u>COUNT III</u>

### <u>Violation of 42 U.S.C. § 1983: Procedural Due Process Under the 14th Amendment of the U.S. Constitution</u>

1-231. Plaintiff incorporates by reference paragraphs 1 through 231 above from the first part of this complaint beginning on page 1 of this Complaint, as if fully set forth herein.

232.    Plaintiff has a clearly established right to equal access to all the benefits and privileges a public education, including, but not limited to, the right to be free from unlawful and discriminatory acts of bullying, unequal punishment and discriminatory punishments and discipline and intimidation at the hand of the educational institution's staff and administrators.

233.    Pursuant to 42 U.S.C. § 1983 "[e]very person who, under the color of any statute, ordinance, regulation, custom, our usage" deprives another person of any rights "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Section1983 "provides a remedy for violations of Federal rights committed by persons acting under the color of state law." *First Midwest Bank v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021).

234.    Plaintiff has a procedural due process right under the Fourteenth Amendment of the U.S. Constitution. Its purpose is to protect the people from the State. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

235.    The District and Terry Bleau and Daniel Jones, acting in their official capacity and individually, were acting "under the color of law" and all times relevant hereto and were the principal actors of the repeated bullying, harassment and intimidation of the Plaintiff as set forth herein and acted with deliberate and willful indifference when they failed to take action to stop such behavior and failed to follow its own policies for investigating and preventing bullying, placing Plaintiff in danger and depriving him of the rights, privileges and immunities afforded him by the United States Constitution, including the unfettered right to public education.

236.    As a result, Plaintiff suffered mental anguish, humiliation, and mental pain and suffering, and loss of the opportunity to attend GMSS and participate in the extracurricular and social events provided by the school.

237.    Defendants Bleau and Jones, in their individual capacity, acted with a callous or reckless indifference, therefore entitling Plaintiff to an award of monetary and punitive damages from the individual Defendant, along with attorneys' fees and costs, and such other and additional relief that this Court deems equitable and just.

WHEREFORE, Plaintiff prays for the following relief:

A.  A judgment against the Defendants awarding Plaintiff BZ Zimny compensatory damages in an amount to be determined at trial.

B.  A judgment against Defendants Bleau and Jones awarding Plaintiff BZ Zimny punitive damages in an amount to be determined at trial.

C.  Prejudgment interest, attorneys' fees, expenses, and costs.

D.  Such other relief as the Court deems just.

## COUNT IV

### Violation of 42 U.S.C. § 1983: Substantive Due Process (State Created Danger) Under the 14th Amendment of the U.S. Constitution

1-231.  Plaintiff incorporates by reference paragraphs 1 through 231 above from the first part of this complaint beginning on page 1 of this Complaint, as if fully set forth herein.

232-235.  Plaintiff incorporates by reference paragraphs 220 through 223 of Count III above, as if fully set forth herein.

236.    Plaintiff has a substantive due process right under the Fourteenth Amendment of the U.S. Constitution. Its purpose is to bar certain arbitrary, wrongful government actions regardless of the procedures used to implement them. *Doe v. Sch. Dist. U-46*, 2021 WL 3849635, at *4 (N.D. Ill. 2021).

237.    The District and Principal Bleau and Assistant Principal Jones were, acting in their official capacity and individually, were acting "under the color of law" and all times relevant hereto and created the danger that Plaintiff was subjected to at school and the Defendant's failure to protect him from that danger what is the proximate cause of his injury, violating his rights to be free from state-created danger.

238.    Defendant's deliberate and willful indifference when it failed to take action to stop GMSS's repeated bullying, harassment and intimidation of the Plaintiff and failed to follow its own policies for investigating and preventing bullying which deprived him of the rights, privileges and immunities afforded him by the United States Constitution, including the unfettered right to public education.

239.     As a result, Plaintiff suffered mental anguish, humiliation, and mental pain and suffering, and loss of the opportunity to attend GMSS and participate in the extracurricular and social events provided by the school.

240.     Defendants Bleau and Jones acted with reckless or callous indifference to the BZ's federally protected rights. Accordingly, BZ is entitled to an award of monetary and punitive damages from Defendants, along with attorneys' fees and costs, and such other and additional relief that this Court deems equitable and just.

WHEREFORE, Plaintiff prays for the following relief:

A.  A judgment against the Defendants awarding Plaintiff BZ Zimny compensatory damages in an amount to be determined at trial.

B.  A judgment against the Defendants Bleau and Jones awarding Plaintiff punitive damages in an amount to be determined at trial.

C.  Prejudgment interest, attorneys' fees, expenses and costs.

D.  Such other relief as the Court deems just.

## COUNT V

### John Zimny as legal guardian of BZ Zimny:
### Intentional Infliction of Emotional Distress

1-231.  Plaintiff incorporates by reference paragraphs 1 through 231 above from the first part of this complaint beginning on page 1 of this Complaint, as if fully set forth herein.

232.     The actions of Terry Bleau, Daniel Jones and Barabaz as set forth herein were taken when they were aware that the aforementioned actions had a high probability of causing emotional distress and resulting physical injury and sickness in an Autistic special needs student such as BZ. The outrageous conduct by Terry Bleau, Daniel Jones and Barabz was either intended to cause or was reckless or in conscious disregard of the high probability of causing BZ severe emotional distress and resulting physical injury and sickness.

233.    As a direct result of Terry Bleau, Daniel Jones and Barabaz's conduct, BZ suffered fear for his safety, suffered humiliation, severe emotional anguish, anxiety, and distress and resulting physical injuries and sickness, and was subjected to scorn, bullying, assault, and ridicule. He required additional therapy for the severe emotional distress, anxiety, physical injury and sickness resulting from this conduct.

234.    The conduct of Terry Bleau, Daniel Jones and Barabaz was committed against BZ intentionally, maliciously, wantonly and willfully.

WHEREFORE, Plaintiff prays for the following relief:

A.  An award of compensatory monetary damages.

B.  Such other relief as the Court deems just.

## COUNT VI

## John Zimny: Violation of the Rehabilitation Act, 29 U.S.C. § 794a

1-231.  Plaintiff incorporates by reference paragraphs 1 through 231 above from the first part of this complaint beginning on page 1 of this Complaint, as if fully set forth herein.

232.    Plaintiff's claims in Count VI arise under the Rehabilitation Act, 29 U.S.C. § 701 *et sequitur*, Public Law 93-112, 87 Stat. 355, as amended, and its implementing regulations, 45 C.F.R. § 84.4(a), which provide in pertinent part that "[A]ny person aggrieved by any act or failure to act by any recipient of Federal assistance" under the Rehabilitation Act may bring suit. 29 U.S.C. § 794a(a)(2). This includes the non-disabled. In fact, "the use of such broad language in the enforcement provisions of the Rehabilitation Act evinces a congressional intention to define standing to bring a private action under the Rehabilitation Act . . . as broadly as is permitted by Article III of the Constitution." *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 47 (internal quotation marks omitted). The standing provision of the Rehabilitation Act, §

794a(a)(2), is distinct from the provision prohibiting discriminatory conduct on the part of the recipient of federal assistance, § 794(a). Therefore, the type of injury a "person aggrieved" suffers need not be "exclu[sion] from the participation in, ... deni[al of] the benefits of, or ... subject[ion] to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a)

233.　Defendant receives federal financial assistance and is therefore subject to the anti-discrimination provisions of the Rehabilitation Act, as herein described.

234.　The bullying BZ. received at the hands of the District 304 personnel or due to the actions of the District 304 personnel caused John Zimny, due to his association with a son with disabilities, tremendous stress, frustration, and mental anguish.

235.　BZ's resultant increased depression, anxiety, isolation, and injury due to the Defendant's discriminatory treatment caused John Zimny tremendous stress, frustration, and mental anguish.

236.　The repeated telephone calls and emails to and from District 304 personnel to John Zimny for alleged bullying, disciplinary concerns and education failures for his son BZ caused John Zimny tremendous stress, frustration, and mental anguish. Additionally, the repeated telephone calls and his trips to school when summoned by Terry Bleau interfered with and had a detrimental effect on John Zimny's employment.

237.　At all relevant times herein, Defendant knew that Plaintiff had a federally protected right to not be treated in a discriminatory manner based on his association with his son. As such, Defendant's acts and omissions alleged herein violated the Rehabilitation Act and its

implementing regulations in one or more or all of the following manners as Defendant has discriminated against Plaintiff by:

A. Denying him the opportunity for the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, or accommodations.

B. Denying him the opportunity to participate in or benefit from Defendant's goods, services, facilities, privileges, advantages, or accommodations.

C. Offering or affording him services that are not equal to those services afforded to other parents or legal guardians whose children do not have disabilities.

D. Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford Defendant's goods, services and facilities to Plaintiff where such modifications would not fundamentally alter the nature of its goods, services or facilities.

E. Acting intentionally and with deliberate indifference in repeatedly requiring Plaintiff to respond to purported disciplinary infractions which were in fact based on his son's disability and the actions of other students without disabilities; in questioning his son who has autism and anxiety disorder, based on his son's disability, without his knowledge or consent; in questioning or conducting disciplinary actions and unfair and discriminatory discipline based on his son's disability without his knowledge or consent.

F. Otherwise having discriminated against Plaintiff because of his relationship with a person with a disability.

238.    As a direct and proximate result of the foregoing, Plaintiff suffered the loss of a civil right and suffered great mental anguish, heightened stress, emotional distress and he was otherwise injured and damaged.

239.    Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d), *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

240.    Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

WHEREFORE, Plaintiff prays for the following relief:

A.  An award of compensatory monetary damages.

B.  An award of attorneys' fees and costs.

C.  Such other relief as the Court deems just.

## **JURY DEMAND**

John Zimny individually, and as the Legal Guardian of BZ , a Minor, Plaintiff hereby demand

trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: August 30, 2022                Respectfully submitted.

                                      **/ s / Ed Hull**          
                                      One of Plaintiff's Attorneys

Ed Hull
Cutler & Hull
33 N. Dearborn Street
Suite 1000
Chicago, IL 60602
312-726-0777
ehull@cutlerhull.com