**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN ZIMNY, individually and on behalf of his minor child, BZ, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 22-cv-4512 |
| v. | ) ) | Hon. Steven C. Seeger |
| GENEVA COMMUNITY UNIT SCHOOL DISTRICT 304, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

BZ entered Geneva Middle School South in August 2021 excited for a new school year. The semester did not go as planned.

Other students bullied BZ, a 12-year-old boy with several disabilities, including autism, anxiety, and gross motor skills problems. BZ's football teammates broke a chain off his neck. A female student threw a bag of chips in his face. A much larger boy (also a football teammate) smacked him with a hockey stick.

BZ (and his parents) asked school officials to step in and stop the bullying. But for the most part, the students who bullied BZ faced no punishment. Meanwhile, BZ endured several detentions – and suspensions – for things he did not do. His mental and physical health were deteriorating. So, operating on doctor's orders, BZ stopped coming to school.

BZ's father, John Zimny, sued the school district (Geneva Community Unit School District 304), Principal Terry Bleau, and Assistant Principal Daniel Jones, bringing six claims about BZ's mistreatment. Defendants moved to dismiss for failure to state a claim.

For the reasons explained below, the Court grants in part and denies in part Defendants' motion to dismiss.

## Background

At the motion to dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In fall 2021, BZ, then a 12-year-old kid, started seventh grade at Geneva Middle School South ("Geneva Middle"). *See* Am. Cplt., at ¶ 14 (Dckt. No 5). BZ has several disorders, including Autism Spectrum Disorder Level 1, Attention Deficit Hyperactivity Disorder, Combined Presentation, Unspecified Anxiety Disorder, social anxiety, and abnormal walking patterns. *Id.* at ¶ 5. Geneva Middle knew about his various diagnoses. *Id.* at ¶ 16. Still, it placed BZ into general education classes. *Id.* at ¶ 18.

Because of his autism and social anxiety, BZ had trouble making friends and was often reserved at school. *Id.* at ¶ 20. BZ was initially excited about the new school year. *Id.* at ¶ 24. But trouble began brewing within the early weeks of the academic year, and BZ reported multiple incidents of bullying. *Id.* at ¶¶ 24–25.

The bullying started in August 2021, when BZ joined the Geneva Middle football team. *Id.* at ¶ 34. BZ's teammates verbally harassed, bullied, mocked, and criticized him. *Id.* at ¶¶ 37, 42–43, 49, 53, 56, 57.

In late August, BZ's mother, Lindsay Zimny, reported the bullying to BZ's special education case manager and counselor, Shelly Rolf. *Id.* at ¶ 39. Around that time, Lindsay

Zimny also emailed Terry Bleau, Geneva Middle's principal, and the football coaches. *Id.* at ¶ 40. BZ and his parents told Daniel Jones, Geneva Middle's assistant principal, about the bullying, too. *Id.* at ¶¶ 44–45. But Jones took no action. *Id.*

The bullying worsened a few weeks later, in September 2021, when BZ and his teammates attended a high school football game. *Id.* at ¶ 53. Geneva Middle students ripped a chain off BZ's neck, and jumped him when he tried to pick up the broken chain. *Id.* at ¶¶ 56–58. BZ and his parents reported the incident to Jones, but Jones did not punish the students involved or end the harassment. *Id.* at ¶¶ 60–63.

Later in September 2021, a female student – who BZ did not know – threw a bag of Doritos in his face at lunchtime. *Id.* at ¶ 67. BZ reported the incident to Jones and got an in-school detention. The Doritos-wielding female student was not punished. *Id.* at ¶¶ 68–70. Jones told John Zimny (BZ's dad) that he would review video footage of the incident but could not share any information. *Id.* at ¶ 71.

More trouble came in October. A male student alleged that BZ said, at lunchtime, that BZ planned to come to the other student's house and shoot him with an "AK." *Id.* at ¶ 79. BZ denied the allegations. *Id.* at ¶ 82.

Yet, Principal Bleau decided that BZ was guilty – without any investigation – and BZ served two in-school suspensions. *Id.* at ¶¶ 86, 90, 97.

That wasn't all. At a meeting about the incident – attended by BZ, John Zimny, and Bleau – Bleau asked a series of questions that BZ perceived as attempting to "manipulate him into saying something had happened that BZ knew did not happen." *Id.* at ¶ 91. At that meeting, John Zimny asked if "normal" kids received the same treatment, and when the "bullying and the unfair treatment" of BZ would end. *Id.* at ¶¶ 92–94. In response, Bleau stood up, kicked his

chair, slammed his hands on the table, and started yelling at the Zimnys, prompting BZ and John Zimny to leave. *Id.* at ¶¶ 94–96.

Later, Geneva Middle investigated and determined that another student, not BZ, had made the comments about the gun. *Id.* at ¶ 100. However, no other student was punished. *Id.* The Zimnys asked for a hearing before the district board about the gun incident, but their request was denied. *Id.* at ¶¶ 108–09, 197.

Another incident occurred later in October 2021: someone drew a penis on BZ's locker. *Id.* at ¶ 111. Jones (the assistant principal) told the Zimnys that he would investigate, but he did not punish any student. *Id.* at ¶¶ 114, 116. Geneva Middle did not remove the drawing for three days. *Id.* at ¶ 117.

In November 2021, a much larger boy struck BZ in the shin with a hockey stick in gym class. *Id.* at ¶¶ 120, 126. The larger boy played football with BZ, and the Zimnys had reported his verbal bullying to Geneva Middle months before, back in August. *Id.* at ¶¶ 121, 123.

BZ went to the nurse's office for treatment after the hit. *Id.* at ¶¶ 128, 130. In the nurse's office, Jones asked BZ rapid-fire questions about what happened, making BZ anxious. *Id.* at ¶¶ 130–31. BZ asked to exit the nurse's office or call his dad, but Jones said no. *Id.* at ¶ 132. The boy later admitted hitting BZ and received a one-day in-school suspension. *Id.* at ¶¶ 139–40.

Meanwhile, BZ had a deep-tissue bruise, a dark purple mark about three inches long. *Id.* at ¶ 133. He felt a lot of pain. *Id.* at ¶ 134. His doctor told him to stay off his feet for 7–10 days. *Id.* at ¶ 133.

BZ missed about a week of school after the hockey stick attack. *Id.* at ¶ 146. On BZ's first day back in late November, Jones called BZ in for questioning about an incident (someone

4

had thrown a folded paper at another student). *Id.* at ¶¶ 147, 152. BZ asked to call his dad, but Jones said no; BZ asked to leave, and Jones said he was "not going anywhere." *Id.* at ¶¶ 149–51.

In December 2021, BZ was attacked in gym class again. *Id.* at ¶ 155. A student hit and shoved BZ. *Id.* at ¶ 157. Afterward, BZ felt so scared and anxious about going to school that his parents decided to keep him home. *Id.* at ¶¶ 184–85. The Zimnys sent Geneva Middle letters from medical professionals saying that BZ should be kept from school. *Id.* at ¶¶ 186, 188.

Through fall 2021 and into early 2022, BZ was suffering mentally and physically. *Id.* at ¶¶ 227, 229. Mentally, BZ experienced severe emotional distress, post-traumatic stress disorder, and anxiety attacks. *Id.* at ¶ 227. Physically, he suffered from stomachaches, headaches, vomiting, chest pains, and emotional outbursts. *Id.* And BZ was washing his hands so excessively that skin was falling off. *Id.*

In February 2022, BZ was still at home (he had not attended school since December), and Defendants began marking BZ's absences as unexcused and threatening the Zimnys with truancy reporting. *Id.* at ¶¶ 186, 188. Jones reported BZ to the Illinois Regional Office of Education, but BZ's situation did not fall within the Office's definition of truancy. *Id.* at ¶ 187.

Around the time of the truancy threats, the Zimnys – worried about BZ's worsening physical and mental health – took BZ to a therapist, who recommended homeschooling. *Id.* at ¶¶ 198–99. The Zimnys requested homeschooling multiple times, but the District refused their requests twice, and did not approve the status after multiple follow-ups. *Id.* at ¶¶ 201–03.

While at home, BZ completed his assignments online, aided by a virtual calendar. *Id.* at ¶¶ 205, 211. The calendar often was incomplete. *Id.* at ¶ 207. And in March 2022, BZ asked teachers for help accessing assignments and using the calendar, but got no reply. *Id.* at ¶ 212.

Then, Defendants informed the Zimnys in March 2022 that they were cutting off educational services for BZ. *Id.* at ¶ 222. Defendants provided the Zimnys no substantive reason for that decision. *Id.* at ¶ 223. And the District denied the Zimnys' request for a hearing about the service cutoff. *Id.* at ¶ 228.

Schools like Geneva Middle can spring into action when a child like BZ is bullied. But throughout fall 2021 – before the Zimnys pulled BZ from school – Geneva Middle did little.

For one, Illinois school districts have a "Child Find" duty, which requires them to evaluate, provide support for, and not discriminate against children with disabilities. *Id.* at ¶ 162. The District did not identify BZ under the Child Find duty in fall 2021. *Id.* at ¶ 165.

Illinois schools can also make a "safety plan" to provide special supervision and support for the safety of a specific student. *Id.* at ¶ 166. Over a two-and-a-half-month period starting in October 2021, BZ's parents made about 37 written requests for a safety plan for BZ, which they sent to District and school officials including Jones and Bleau. *Id.* at ¶¶ 170–72. The district did not propose a safety plan until months later, in January 2022. *Id.* at ¶ 174.

And the January 2022 safety plan went against the Zimnys' wishes – it did not pursue school-based supports for BZ (like case study evaluation or social work services). *Id.* at ¶¶ 175–76. The proposed plan also kept John Zimny away from the school, despite BZ's stated preference for having his father present if questioned by school officials again. *Id.* at ¶ 177. The Zimnys proposed changes to the safety plan, which the District ignored. *Id.* at ¶ 179.

Schools can also set up a domain meeting to request an evaluation and more support for a student. *Id.* at ¶ 192. BZ's parents had a domain meeting in November 2021. *Id.* at ¶ 191. At that meeting, District employees determined that BZ didn't need an evaluation. *Id.* at ¶ 194. The Zimnys disagreed. *Id.*

6

Finally, BZ's parents asked multiple times, beginning in August 2021, to receive notice if any incidents occurred at school – but they received no such notifications. *Id.* at ¶¶ 195–96. Throughout this time, BZ became increasingly scared of going to school, and suffered a range of physical symptoms including stomachaches, headaches, vomiting, chest pains, and excessive handwashing (causing skin loss). *Id.* at ¶ 229.

BZ's father, John Zimny – individually and on BZ's behalf – sued Defendants Geneva Community Unit School District 304 ("the District") and two school officials, Principal Terry Bleau and Assistant Principal Daniel Jones. *Id.* at ¶¶ 6–13. The operative complaint includes six counts – five under federal law (Counts I to IV, VI) and one under state law (Count V).[1]

Counts I through V are brought on behalf of BZ. *Id.* at 38–47. Count I claims that Defendants failed to protect BZ from disability-based harassment and intimidation, in violation of the Rehabilitation Act, 29 U.S.C. § 794(a). *Id.* at 39, ¶ 234.

Count II is a claim under the Americans with Disabilities Act, 42 U.S.C. § 12132. *Id.* at 41, ¶ 233. The complaint alleges that Defendants violated the ADA by: (1) failing to provide BZ with modifications or a timely Safety Plan; (2) failing to fulfill their Child Find responsibilities; (3) failing to prevent bullying and harassment by Geneva Middle students and staff; (4) reporting BZ as truant; (5) failing to train Geneva Middle employees in dealing with disabled students; and (6) failing to exonerate BZ as a potential shooter. *Id.*

---

[1] Candidly, the numbering of paragraphs in the amended complaint gets wonky at this point. Each count begins anew with "¶ 232." *See* Am. Cplt., at 38–48 (Dckt. No. 5). Repeatedly using the same paragraph number makes things difficult when you want to cite a paragraph number. For example, if the Court wanted to cite paragraph 236, the reader wouldn't know *which* paragraph 236 the Court is referring to. One paragraph 236 appears on page 40, and another paragraph 236 appears on page 44, and another paragraph 236 appears on page 45, and another paragraph 236 appears on page 48. That's confusing. To curb confusion, the Court cites both the paragraph and page number when citing the counts.

Count III alleges, under 42 U.S.C. § 1983, that Defendants deprived BZ of his right to due process under the Fourteenth Amendment. *Id.* at 43–44, ¶¶ 232–37. Zimny claims that, acting in their official capacity, Defendants denied BZ due process by failing to follow their own policies for investigating and preventing bullying. *Id.* at 44, ¶ 235. Zimny also claims that Defendants Bleau and Jones, in their individual capacity, acted with callous or reckless indifference. *Id.* at 44, ¶ 237.

Count IV alleges, under 42 U.S.C. § 1983, that Defendants Bleau and Jones deprived BZ of his right to substantive due process under the Fourteenth Amendment. *Id.* at 45–46, ¶¶ 236–40. Zimny claims that Defendants created the danger that BZ experienced at school and failed to protect him from that danger. *Id.* at 45, ¶ 237.

Count V, the sole state law claim, alleges intentional infliction of emotional distress by Bleau and Jones against BZ. *Id.* at 46–47, ¶¶ 232–34.

Count VI is the last claim, and John Zimny (the father) is the plaintiff. John Zimny alleges that Defendants treated him in a discriminatory way because of his son's disability. *Id.* at 48, ¶ 237.

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Dean v. Nat'l Prod. Workers Union Severance Tr. Plan*, 46 F.4th 535, 543 (7th Cir. 2022). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When sitting in diversity, the Court "must exercise care and caution" in applying state

law. *Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021). The Court's task is to

determine how the state's highest court would rule, with the decisions of the state's intermediate

appellate courts providing controlling guidance "unless there is a convincing reason to predict

the state's highest court would disagree." *Id.* (quotation marks omitted).

## Analysis

## I.      Rehabilitation Act (Count I) and Americans with Disabilities Act (Count II)

Counts I and II allege that Defendants violated the Rehabilitation Act, 29 U.S.C. § 794,

and the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12189. They are intertwined.

Count I claims that Defendants violated Section 504 of the Rehabilitation Act in several

ways. The alleged violations include (1) allowing other students to discriminate against and

harass BZ; (2) discriminating against BZ; and (3) "disproportionately disciplining" BZ. *See* Am.

Cplt., at 39–40 (Dckt. No. 5). Count II contends that Defendants violated Title II of the ADA.

*Id.* at 41.

Both the Rehabilitation Act and the ADA generally prohibit discriminating based on

disability in public programs. *See H.P. ex rel. W.P. v. Naperville Cmty. Unit Sch. Dist. #203*,

910 F.3d 957, 960 (7th Cir. 2018).

"Title II [of the ADA] forbids any 'public entity' from discriminating based on disability;

Section 504 applies the same prohibition to any federally funded 'program or activity.'" *Fry v.*

*Napoleon Cmty. Sch.*, 580 U.S. 154, 159 (2017). "A regulation implementing Title II requires a

public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Id.* at 159–60.

Likewise, "courts have interpreted § 504 [of the Rehabilitation Act] as demanding certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities. . . . And both statutes authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages." *Id.* at 160.[2]

Basically, pleading the elements of a Title II claim under the ADA is the same as pleading the elements of a Section 504 claim under the Rehabilitation Act. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (describing claims under Title II and Section 504 as "functionally identical"); *see also Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 845 n.6 (7th Cir. 1999) (explaining that "the standards applicable to one act are applicable to the other").

The parties discuss Counts I and II side by side. *See, e.g.*, Defs.' Mem. in Support of Mtn. to Dismiss, at 3 (Dckt. No. 17); Pls.' Resp. to Defs.' Mtn. to Dismiss, at 1–3 (Dckt. No. 18). So, the Court will do the same.

The Court will first address whether BZ had a disability within the meaning of the statutes. The Court will then consider whether the complaint plausibly alleges disability-based discrimination. Finally, the Court will address Defendants' argument that BZ failed to exhaust administrative remedies.

---

[2] There's a small difference between the statutes – the ADA allows mixed-motive claims, whereas Section 504 does not. *See* 29 U.S.C. § 794(a) (banning discrimination "*solely* by reason of" the person's disability) (emphasis added); *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019). For purposes of assessing this motion to dismiss, this distinction is not relevant.

A.    **Disability Status**

The ADA and Rehabilitation Act don't apply absent a disability.  *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).  The statutes define a disability as (1) a "physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such an impairment."  *See* 42 U.S.C. § 12102(1).  Whether an individual has a disability is a fact-intensive inquiry made on a case-by-case basis.  *See Merry v. A. Sulka & Co.*, 953 F. Supp. 922, 926 (N.D. Ill. 1997); *see also Black ex rel. J.D.*, 2020 WL 469303, at *7.

Defendants believe that Zimny takes an "overbroad interpretation of the types of conditions that qualify as disabilities under Section 504 and the ADA."  *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 4 (Dckt. No. 17).  Defendants argue that BZ's "abnormal" walking movements are not a qualifying disability and did not "limit[] his participation in some major life activity."  *Id.* at 4–5.

The complaint sufficiently alleges that BZ's abnormal walking counts as a disability.  In particular, Zimny states that:  "[t]he way BZ runs are [sic] characteristic of BZ's *gross motor problems* that are part of and which are one of his disabilities."  *See* Am. Cplt., at ¶ 122 (Dckt. No. 5) (emphasis added).  That's enough to survive a motion to dismiss.

True, BZ joined the (no cut) football team and was mainstreamed for gym class.  *Id.* at ¶¶ 34–35, 125.  But those facts don't preclude the reasonable inference that BZ was disabled.

BZ apparently was not very good at football.  *See id.* at ¶ 42 (linking comments that BZ "sucked" at football and "that was the reason he didn't get much playing time" to statements mocking the way BZ "walks and runs").  He had problems with gross motor skills.  Those problems affected his ability to walk, and his teammates and classmates could see as much.

11

So, Zimny has plausibly pled that BZ's abnormal walking was a disability.

## B.  Disability-Based Discrimination

The Court turns next to whether Zimny was discriminated against based on a disability.

The allegations of Count I and Count II fall into three buckets.  One bucket alleges that Defendants *themselves* committed disability-based discrimination against BZ.  *Id.* at 38–42.  A second bucket contends that Defendants acted with deliberate indifference to disability discrimination by BZ's classmates.  *Id.*  The final bucket alleges that Defendants failed to provide BZ with requested disability-based accommodations.  *Id.*  The Court will address each group of allegations in order.

### 1.  Discrimination by Defendants

First, the Court looks at Zimny's allegations that Defendants themselves discriminated against BZ because of his disability.

To plausibly state a disability discrimination claim under the ADA or the Rehabilitation Act, a plaintiff must allege that:  "(1) he is a qualified person (2) with a disability and (3) the [defendant] denied him access to a program or activity because of his disability."  *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

Defendants contend that "Count I & II's allegations of disability discrimination amount to nothing more than vague speculations. . . [and] reminders that – by the way – B.Z. has a disability."  *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 5–6 (Dckt. No. 17).  Defendants also argue that "Plaintiff makes no actual connection to a disability as being the motive other than simply concluding that the District acted 'by reason of disability.' . . .  [T]he pleaded facts effectively show that Defendants had reasonable conduct-based grounds for their disciplinary determinations, none of which had to do with autism."  *Id.* at 5.

12

The Court disagrees.  The complaint points to multiple incidents where BZ received harsher punishments compared to other, nondisabled students.

For starters, BZ received an in-school detention after a female student threw a bag of Doritos at him – and the female student went unpunished.  *See* Am. Cplt., at ¶¶ 67–72 (Dckt. No. 5).

In the same vein, BZ received *two* days of in-school suspension and could not play after-school sports after someone falsely accused of threatening to shoot another student, while the student who actually made the remark was never punished.  *Id.* at ¶¶ 97–102, 141.  By contrast, after striking BZ with a hockey stick – and leaving BZ with a nasty bruise – a nondisabled student received just *one* day of in-school suspension and continued playing after-school sports.  *Id.* at ¶¶ 139–44.

In other words,  a nondisabled student who purposely injured BZ got a punishment half the length of the punishment BZ received for something he did not do.

Also, when John Zimny asked Principal Bleau whether "normal" students received the same punishments as disabled students, Bleau declined to answer and became angry.  *Id.* at ¶ 92.  Taken in the light most favorable to Zimny, Bleau's non-answer (and anger) suggest that Zimny struck a nerve because Bleau *did* punish disabled kids more harshly than other kids.

For now, Zimny has done enough to plausibly allege that Defendants treated him worse than other students because of his disability.  So, Zimny's direct bullying claim can stand.

### 2.    Deliberate Indifference to Discrimination by Others

The Court now turns to Zimny's peer-to-peer harassment claim.

For peer-to-peer harassment claims, "a plaintiff must show that: (1) the plaintiff is an individual with a disability, (2) he or she was harassed based on that disability, (3) the

harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, (4) the defendant knew about the harassment, and (5) the defendant was deliberately indifferent to the harassment." *Doe v. Bd. of Educ. of City of Chicago*, 611 F. Supp. 3d 516, 531 (N.D. Ill. 2020).

The motion to dismiss attacks only elements one (disability status) and two (harassment *because of* disability status). As discussed above, Zimny has pled adequate facts showing that BZ's different walking patterns count as a disability. So the Court focuses on element two.

In Defendants' view, the complaint just shows that BZ was a disabled person who was bullied – not that he was bullied *because of* his disability. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 6 (Dckt. No. 17) (emphasis in original).

The Court disagrees. Zimny alleges that BZ's football teammates "mocked, on multiple occasions" the way that BZ walks and runs, "which is characteristic of his problems with gross motor skills." *See* Am. Cplt., at ¶ 42 (Dckt. No. 5).

That mocking turned to physical attacks: teammates who mocked BZ later ripped off his neck chain, and the ex-teammate who whacked BZ with a hockey stick had previously mocked BZ's running. *Id.* at ¶¶ 53–58, 119–126.

Those facts support a reasonable inference that students bullied BZ *because of* his disability (specifically, his problems with gross motor skills).

Of course, a disabled student getting bullied doesn't automatically mean the bullying is because of the student's disability. *See Funes ex rel. C.F. v. Gardner Consol. Sch. Dist. 72C*, 2022 WL 1556104, at *6 (N.D. Ill. 2022) ("Simply because a disabled person was bullied does not, without more, compel the conclusion that the bullying was based on [the person's] disability."). Still, the complaint alleges that students bullied BZ for his gross motor skills

14

problem:  students mocked him *because* he ran and walked differently.  He walked and ran differently *because* he was disabled.

Therefore, Zimny has plausibly pled a peer-to-peer harassment theory, and the Court will allow Counts I and II to proceed on that theory.

### 3.      The Failure to Accommodate

The final bucket is the failure to accommodate.  Accommodations are "only . . . required when *necessary* to avoid discrimination on the *basis* of a disability."  *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 529 (7th Cir. 2014) (emphasis in original).  "Disabled students in particular are entitled to reasonable accommodations that ensure them access to a 'free[,] appropriate public education.'"  *Id.* (quoting 34 C.F.R. § 104.33(a)).

"A regulation implementing Title II [of the ADA] requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination."  *Fry*, 580 U.S. at 159–60; *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985).  The Rehabilitation Act does not contain a general accommodation requirement, but "the Supreme Court has located a duty to accommodate in the statute generally."  *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 747 (7th Cir. 2006).

Defendants argue that "Count II alleges specific 'failures' by the District that were not requested as reasonable accommodations."  *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 8 (Dckt. No. 17).

In Zimny's view, the complaint "alleges that the accommodations sought by Plaintiffs were repeatedly requested," including requests for fair punishment of regular education students,

a functioning online calendar, homebound schooling, and a safety plan.  *See* Pls.' Resp. to Defs.'

Mtn. to Dismiss, at 4 (Dckt. No. 18).[3]

Defendants agree that the Zimnys requested a safety plan and homeschooling, and do not

argue that BZ failed to request an online calendar.  *See* Defs.' Mem. in Support of Mtn. to

Dismiss, at 10 (Dckt. No. 17).

"Whether a requested accommodation is reasonable or not is a highly fact-specific

inquiry and requires balancing the needs of the parties."  *Oconomowoc Residential Programs v.*

*City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002).  "However, an accommodation is

unreasonable if it imposes significant financial or administrative costs, or it fundamentally alters

the nature of the program or service."  *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d

587, 594 (7th Cir. 2018).

Drawing inferences in Zimny's favor, the requested accommodations (for the safety plan,

homeschooling, and online calendar) are reasonable.  The Court addresses each in turn.

Start with the safety plan request.  The Zimnys made 37 requests for a safety plan.  *See*

Am. Cplt., at ¶ 178 (Dckt. No. 5).  They wanted a safety plan that provided school-based

supports for BZ (*e.g.*, case study evaluation and social work services).  *Id.* at ¶ 176.  They also

wanted a provision in the plan requiring BZ's father's presence whenever BZ was questioned by

Geneva Middle personnel.  *Id.* at ¶ 180.

---

[3]  Defendants say that the complaint alleges a failure to fulfill Child Find obligations but "flatly concedes" that the District had met its Child Find responsibilities (under the Rehabilitation Act).  *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 9 (Dckt. No. 17).  Zimny seems to concede as much and offers no response on this point.  *See generally* Pls.' Resp. to Defs.' Mtn. to Dismiss (Dckt. No. 18).  Defendants also allege that, although Count II claims that Defendants did not properly train District personnel in dealing with a disabled student, it fails to specify what procedures the District should have followed.  *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 9.  Zimny offers no response here, either, and appears to concede this point as well.  *See generally* Pls.' Resp. to Defs.' Mtn. to Dismiss.

Defendants argue that "the conclusion is obvious as to why the District would reject this safety plan despite it being requested thirty-seven times over – it was neither reasonable nor required." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 10 (Dckt. No. 17).

But the pleadings support a reasonable inference that the safety plan requests are reasonable.

Take the requests that John Zimny be present if BZ were called into the principal's office. Principal Bleau previously called John Zimny in for two in-person meetings – in the same day – after a student accused BZ of bringing a gun to school. *See* Am. Cplt., at ¶¶ 85, 89 (Dckt. No. 5). Defendants got BZ's dad involved before, and presumably could do so again.

Thus, Zimny can proceed with a failure to accommodate claim about the safety plan.

Now take the homeschooling request. The Zimnys followed the proper procedures to request homeschooling and submitted documentation from medical professionals. *Id.* at ¶¶ 201–03.

Defendants argue that the complaint does not show that the "District lacked discretion to approve or deny" a homeschool request. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 10 (Dckt. No. 17). But the District had procedures for requesting homeschooling – so some students presumably received that accommodation.

The Court cannot say that BZ's request for a homeschooling accommodation was *per se* unreasonable, when the District itself allowed that accommodation.

And the requests for a working calendar seem reasonable, too. District personnel told BZ that they would provide him an online calendar of daily assignments – but teachers didn't update it regularly. *See* Am. Cplt., at ¶¶ 205, 207 (Dckt. No. 5). Then, BZ's teachers ignored his

17

requests for help accessing assignments and using the calendar. *Id.* at ¶ 212. The District's failure to maintain might be unreasonable.

So Zimny can proceed on a failure to accommodate theory under Counts I and II.

### C. Exhaustion

Defendants contend that Zimny's Count I and II claims should be dismissed for failure to exhaust. They argue that the Court must dismiss any allegations about access to a free, appropriate public education because Zimny has not pleaded exhaustion of administrative remedies under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 8 (Dckt. No. 17).

If "a lawsuit seeks relief for the denial of a [free, appropriate public education]," then "the plaintiff must first submit her case to an IDEA hearing officer, experienced in addressing exactly the issues she raises." *Fry*, 580 U.S. at 168 (citing 20 U.S.C. § 1415). "[T]he plaintiff cannot escape [the IDEA's exhaustion requirement] merely by bringing her suit under a statute other than the IDEA," such as the Rehabilitation Act or the ADA. *Id.* A court must look to the "gravamen" of the plaintiff's complaint to determine whether the plaintiff seeks relief for denial of a free, appropriate public education. *Id.* at 169.

Failure to exhaust under the IDEA is an affirmative defense. *See Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 532–33 (7th Cir. 2006). The plaintiff has "no obligation to allege facts negating an affirmative defense in her complaint," so "the earliest possible time to consider [the exhaustion defense] would normally be after the answer has been filed." *Id.* at 533. However, the Court may grant a motion to dismiss on failure to exhaust grounds if something on the "face of the complaint [] compels a conclusion" that the plaintiff failed to exhaust. *Id.*

Zimny does not plead that BZ exhausted the remedies available under the IDEA. But he didn't have to do so. And "nothing on the face of the complaint compels a conclusion" that Zimny failed to exhaust. *Mosely*, 434 F.3d, at 533.

The Court thus will not dismiss Counts I and II for failure to exhaust. Defendants can raise that affirmative defense in their answer.

One final point. Defendants say that the Court should dismiss Count I and Count II for the individual defendants (Bleau and Jones) because the Rehabilitation Act and ADA don't allow for individual liability. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 3 (Dckt. No. 17).

That's right. The ADA and Rehabilitation Act do not provide for individual liability. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015). So Zimny cannot sue Bleau and Jones under those Acts.

In sum, Zimny can proceed on Counts I and II against the District on the direct discrimination, peer-to-peer harassment, and failure to accommodate theories. But those counts are dismissed with prejudice against Jones and Bleau, since the ADA and Rehabilitation Act do not provide for individual liability.

## II.   Due Process (Count III)

Count III is a section 1983 claim alleging that Defendants violated BZ's Fourteenth Amendment right to due process. Zimny sues Defendants individually and in their official capacities. *See* Am. Cplt., at 43–44 (Dckt. No. 5).

Section 1983 "provides a remedy for violations of federal rights committed by persons acting under color of state law. To prevail on a § 1983 claim, the plaintiff must prove that '(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law.'" *First*

*Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (quoting *Buchanan-Moore v. Cnty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009)).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1. "To state a claim for a procedural due process violation, a plaintiff must demonstrate (1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Manistee Apts., LLC v. City of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016).

"To show a failure of due process, a plaintiff might show that state procedures as written do not supply basic due process or that state officials acted in an 'random and unauthorized' fashion in depriving the plaintiff of his protected interest." *Strasburger v. Bd. of Educ., Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 358 (7th Cir. 1998).

The amount of process due depends on the context. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (Barrett, J.) ("Determining what is fundamentally fair is always a context-specific inquiry.").

Defendants attack Count III on a few grounds. The Court first considers whether Zimny adequately alleged a due process violation. The Court next turns to whether the District, and Bleau and Jones in individual and official capacities, can be held liable under section 1983. The Court last considers Defendants' arguments about post-deprivation remedies.

### A.     Alleged Due Process Violations

Zimny claims that Defendants violated BZ's due process rights in several different ways. The alleged violations included suspending BZ before investigating, denying BZ's request to call

his parents after his injury, ignoring the Zimnys' written requests for a safety plan, and failing to punish other students.[4] *See* Am. Cplt., at ¶¶ 75–103, 130–32, 169–73, 198–203 (Dckt. No. 5).

Because due process is a context-specific inquiry, *see Horowitz*, 435 U.S. at 86, the Court addresses each of Zimny's claims in turn.

### 1. The Suspensions

The Court turns first to BZ's suspensions. BZ served two in-school suspensions after he was accused of threatening to shoot another student. *See* Am. Cplt., at ¶¶ 79–100 (Dckt. No. 5). When BZ told "Bleau that BZ did not do what Bleau concluded BZ did," Bleau did not listen, and no investigation occurred before BZ served his suspensions. *Id.* at ¶¶ 86, 88, 90, 92, 99–100. Geneva Middle also denied the Zimnys' request for a post-suspension hearing. *Id.* at ¶ 109.

"Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975), *see also Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (Barrett, J.). "[N]o delay is necessary between the time notice is given and the time of the discussion with the student." *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 428 (7th Cir. 1997).

When explaining his side of the story, the student needs to "first be told what he is accused of doing and what the basis of his accusation is." *See Goss*, 419 U.S. at 582. "[A]s a

---

[4] The amended complaint might be read to allege that Defendants also violated the right to due process by denying a request for homeschooling. That allegation does not appear in the summary of the count. But the response brief suggests that homeschooling is part of the claim. (A response brief cannot amend a complaint, but the Court will put that issue aside.). For now, the Court will simply say that it is unsure if Zimny is alleging a due process claim about homeschooling. If so, Zimny could move for leave to amend the complaint if necessary, and the parties could address it at summary judgment.

general rule notice and hearing should precede removal of the student from school." *Id.* A plaintiff also must show that – with due process – the suspension would not have happened. *See Carey v. Piphus*, 435 U.S. 247, 260 (1978). In other words, the lack of procedural due process must *cause* the suspension. *Id.*

Bleau accused BZ of threatening another student. *See* Am. Cplt., at ¶¶ 79–100 (Dckt. No. 5). BZ denied the allegations, but Bleau did not let BZ explain what happened. *Id.* at ¶¶ 82, 88. BZ then served two in-school suspensions. *Id.* at ¶ 90. And BZ was later cleared of the charge. *Id.* at ¶ 100.

*Goss* requires school officials to let students tell their side of the story before imposing days-long suspensions. *See Goss*, 419 U.S. at 581–82. Bleau gave BZ no such opportunity. Plus, BZ was innocent – so one could reasonably infer that due process could have prevented the suspension. Thus, Zimny has adequately pled that Bleau violated BZ's right to due process.

### 2. The Denial of Calls to his Father

The Court turns next to the denial of BZ's request to call his father.

As a reminder, Assistant Principal Jones questioned BZ in the nurse's office after another student struck BZ with a hockey stick. *See* Am. Cplt., at ¶¶ 131–32 (Dckt. No. 5). BZ asked for permission both to leave the room and call his dad. *Id.* Jones denied both requests. *Id.* The complaint does not state whether Geneva Middle policy required administrators to call parents in this situation.

In assessing whether a procedural due process violation occurred, a court must first determine if the "plaintiff was deprived of a protected interest." *See Leavell v. Illinois Dep't of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010). "[T]he failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due

process." *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 706 (7th Cir. 2002); *see also Wallace v. Tilley*, 41 F.3d 296, 301 (7th Cir.1994).

Similarly, the failure to comply with the school's own policies – such as those set forth in a student handbook – does not in and of itself constitute a procedural due process violation. *See Martin*, 295 F.3d at 706; *see also Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993). But on the flipside, "an action can violate the Due Process Clause without violating state procedures." *Cozzi v. Vill. of Melrose Park*, 592 F. Supp. 3d 701, 711 (N.D. Ill. 2022).

Zimny's theory about the nurse's office fails at the first step of the procedural due process analysis: he had no protectible interest at stake. Zimny claims that Jones violated BZ's procedural due process rights by denying him the opportunity to call his father. *See* Am. Cplt., at ¶¶ 131–32 (Dckt. No. 5).

But under the Due Process Clause, a child has no protected interest in calling their parents after an incident at school. No protectible interest is at stake here. And without a protectible interest, there cannot be a due process violation.

So, Jones failing to allow BZ to call his father did not violate procedural due process.

### 3.    The Lack of a Safety Plan

Next, the Court turns to Zimny's theory that Defendants violated BZ's due process right by not responding to the Zimny's requests for a safety plan. *See* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 6 (Dckt. No. 18).

Illinois school districts can prepare a safety plan to provide special supervision and support for a particular student's safety. *See* Am. Cplt., at ¶ 166 (Dckt. No. 5).

Over a two-month period beginning in October 2021, the Zimnys made 37 written requests for a safety plan – which the District repeatedly ignored. *Id.* at ¶¶ 170–73. The District

proposed a safety plan in January 2022, but the Zimnys found that plan inadequate. *Id.* at ¶ 174. The Zimnys requested changes to that plan, but the District ignored their requests. *Id.* at ¶ 179.

Illinois law allows schools to make safety plans for individualized students. But it does not seem to *require* schools to make such plan. So a student does not have a constitutionally protectible interest in having a safety plan made.

And even if there *were* such an interest, Zimny's claim would still face an uphill battle. The District made a safety plan for BZ. *Id.* at ¶ 174. It just took longer than the Zimnys wanted, and the Zimnys did not like it. *Id.* at ¶¶ 170–79.

The fact that the Zimnys found the proposed safety plan unsatisfactory does not bolster the due process claim. Defendants had to provide *due* process – not whatever process satisfies the litigants' wishes. And the Defendants seemingly provided a constitutionally sufficient process.

### 4. The Lack of Discipline

Finally, Zimny argues that other students should have received discipline.

Defendants contend that the right to a public education does "not entail a due process right to have other students disciplined." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 14 (Dckt. No. 17) (quoting *Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, 2022 WL 170047, at *5 (2022) (dismissing procedural due process claim where "Plaintiffs have cited no case law to support their claim that procedural due process affords Plaintiffs a right to have other students disciplined")).

Zimny seems to concede as much. His response states that "[t]he Defendants agree on the law that is the basis for Count III." *See* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 5 (Dckt. No.

24

18). And that concession is unavoidable. A student does not have a protectible interest in seeing other students punished – let alone a *constitutionally protected* interest.

In sum, Zimny has adequately pled a protectible interest about BZ's two-day suspension. To the extent that Count III is based on anything else, it fails.

### B. Individual and Official Capacity

Through this point, the Court has analyzed Count III without distinguishing between the individual capacity and official capacity claims. The Court now separates the two in that order.

The individual capacity claims pertain to Bleau (the principal) and Jones (the assistant principal).

As explained above, the complaint pleads that Bleau himself violated BZ's procedural due process right. Bleau did not allow BZ to tell his side of the story before slapping BZ with two in-school suspensions. By contrast, Zimny has not pled that Jones violated BZ's procedural due process right. Jones did not let BZ call his father after BZ suffered an injury, but BZ had no protected interest in such a phone call. No protected interest means no procedural due process violation.

So the claim against Bleau in his individual capacity survives, but not the claim against Jones in his individual capacity.

Now, the Court turns to the claims against Defendants in their official capacity. Under *Monell*, a municipal unit is not liable for a section 1983 claim based on *respondeat superior*. *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). Instead, a plaintiff needs to show that a government policy or custom caused their injury. *Id.*

The Seventh Circuit's "case law establishes that unconstitutional policies or customs take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a

widespread practice, that, although unauthorized, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury." *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004).

Defendants argue that "Count III does not allege a claim under any of the three [*Monell*] theories." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 19 (Dckt. No. 17). So, the Court addresses each of the potential *Monell* theories in order.

For the first theory (express policy), Defendants contend that "the claim laments that policies were *not* followed." *Id.* (emphasis original).

The Court agrees. Zimny claims that Defendants violated several express policies, including policies providing for pre-suspension investigation, hearings about in-school suspensions, and parental notification after incidents. *See* Am. Cplt., at ¶¶ 87, 109, 195 (Dckt. No. 5). Zimny repeatedly states that Defendants *ignored* policy when dealing with BZ – *not* that the District policies were flawed. So he cannot proceed with a *Monell* theory about an express policy.

Next, Defendants say that the second theory ("custom or usage") fails because Zimny does not allege a particular "custom" that was in place. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 19 (Dckt. No. 17).

The Court agrees. At bottom, Zimny's allegations suggest that BZ was singled out. Other, non-disabled students got safety plans, had hearings before they were suspended, and served no suspension time after transgressions. *See* Am. Cplt., at ¶¶ 87, 100–01, 109, 168–69 (Dckt. No. 5). BZ was treated differently. Defendants acted *against* custom, not in line with it.

So, BZ cannot pursue a *Monell* claim rooted in a widespread District custom.

Finally, Defendants argue that that the third theory (final policymaking authority) fails because the complaint does not "identify a single factual instance where Defendants allegedly acted in violation of B.Z.'s procedural due process rights." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 13 (Dckt. No. 17); *see also id.* at 19.

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "The fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82. "Municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483.

"[A] court must look to state law to determine who has final policymaking authority . . . ." *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1325 (7th Cir. 1993); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). If state or local law gives final policymaking authority to a certain actor – *e.g.*, a school board – then the court still must consider whether that actor *delegated* their authority to another official. *See Cornfield by Lewis*, 991 F.2d at 1325–26.

Zimny adequately pleaded that Bleau – the principal – violated BZ's right to due process by handing down two in-school suspensions to BZ without giving BZ the opportunity to tell his side of the story.

The complaint suggests that Bleau had final decisionmaking authority. Bleau was the principal, and he suspended BZ for two days. *See* Am. Cplt., at ¶ 97 (Dckt. 5). It's reasonable to

infer that a school principal has *carte blanche* in determining whether to give a student a days-long punishment. So, BZ has adequately pled a violation by Bleau in his official capacity – and therefore, a claim against the District.

The story is different for Jones. Jones would not let BZ leave the nurse's office or call his father. Those restrictions do not amount to a violation of due process. So Zimny has not alleged a due process violation against Jones in any capacity (official or individual).

### C. Inadequacy of Post-Deprivation Remedies

Defendants also contend that Count III should be dismissed because it "fails to set forth allegations that plausibly demonstrate that Plaintiff has no procedural avenue by which to address the alleged deprivation of B.Z.'s right to a public education." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 17 (Dckt. No. 17).

"[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).

If a plaintiff brings a due process claim based on "random and unauthorized" conduct of a state actor (like Zimny does), there is another requirement. *See Doherty v. City of Chicago*, 75 F.3d 318, 323 (7th Cir. 1996). In such an instance, "[w]here state law remedies exist, a plaintiff must either avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate." *Id.* at 323; *see also Strasburger*, 143 F.3d at 358 ("State law remedies in theory can satisfy due process as well as federal ones, so we require plaintiffs seeking federal remedies to show the state's remedies lacking.").

Zimny has not pleaded that state law remedies were inadequate. He alleges that school officials violated school policy, so he must show that he sought state law remedies before turning to the U.S. Constitution. And Zimny has not alleged or shown that Illinois post-deprivation remedies are lacking.

Demonstrating that "available state remedies are inadequate is an essential part of [a plaintiff's] case." *Doherty*, 75 F.3d at 323–24. It sounds like an affirmative defense (like exhaustion), but in reality, it is part of the claim itself. Zimny does not allege that available state remedies were inadequate, so the due process claims must be dismissed.

Last, Defendants argue that "the official capacity claims brought against those individuals can be dismissed as duplicative." *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 19 (Dckt. No. 17). Zimny seems to concede as much in his response brief. *See* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 18) ("Defendants agree on the law that is the basis for Count III[.]").

"Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Suing the District and the individual defendants in their official capacity "makes no practical difference; the [District] is liable for the official actions" of Bleau and Jones either way. *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987). So, courts in this district frequently dismiss counts where individual defendants are sued in their official capacity and municipal defendants are also sued. *See Davis v. Vill. of Hazel Crest*, 2018 WL 835224, at *3 (N.D. Ill. 2018) (collecting cases).

The Court agrees with Defendants that it is redundant to sue both the District and the District officials in their official capacities. So, the Court dismisses Count III for Jones and Bleau in their official capacities.

In sum, the Court dismisses Count III in its entirety.

## III.    Substantive Due Process (Count IV)

Count IV is a section 1983 claim alleging that Defendants violated BZ's right to substantive due process under the Fourteenth Amendment. Zimny sues all Defendants under Count IV, bringing claims against Bleau and Jones both in their individual and official capacities. *See* Am. Cplt., at 45, ¶ 237 (Dckt. No. 5).

"In order to state a § 1983 claim, a plaintiff must sufficiently allege that: (1) a person acting under color of state law (2) deprived her of a right, privilege, or immunity secured by the United States Constitution or laws." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 653 (7th Cir. 2011).

The Due Process Clause of the Fourteenth Amendment protects the right to life, liberty, and property. *See* U.S. Const. amend. XIV, § 1. The Supreme Court has held that students have a "legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause . . . ." *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 660 (7th Cir. 2019) ("High school students (and, for that matter, elementary school students) have a property interest in their public education because state law entitles them to receive one.").

"The touchstone of due process is protection of the individual against arbitrary action of government." *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998) (cleaned up). "Only the most egregious official conduct is arbitrary in the constitutional sense. An abuse of power is arbitrary if it 'shocks the conscience,' but the plaintiff must show that the official conduct is unjustifiable by *any* governmental interest." *Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1013 (7th Cir. 2002) (cleaned up).

Zimny's allegations come in two varieties. First, Zimny alleges that Defendants Jones and Bleau directly bullied BZ.[5] Second, Zimny alleges that the District, Jones, and Bleau bear responsibility for the bullying by other students under a state-created danger theory. *See* Am. Cplt., at 45–46, ¶¶ 236–40 (Dckt. No. 5); *see also* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 7–9 (Dckt. No. 18).

The Court will consider the direct bullying theory, and then the state-created danger theory.

### A.     Direct Bullying by the District Itself

Defendants put forward a narrow reading of the complaint. As they see it, Zimny simply alleges "that the District's behavior was only harmful simply because it failed to prevent bullying by peers." *See* Defs.' Reply, at 5 (Dckt. No. 20).

But the complaint alleges that Bleau and Jones *themselves* bullied BZ. *See* Am. Cplt., at 45, ¶ 238 (Dckt. No. 5); *see also* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 9 (Dckt. No. 18) (referring to "direct bullying" by Defendants). The alleged behavior could give rise to a claim.

Start with Principal Bleau. In October 2021, Bleau allegedly tried to manipulate BZ to say that he had threatened to shoot another student. *See* Am. Cplt., at ¶ 91 (Dckt. No. 5). When BZ's father told Bleau that Defendants were treating BZ unfairly, Bleau grew angry and kicked his chair, slammed his hands on the table, and started screaming. *Id.* at ¶¶ 93–96. The District later determined that another student made the comments – *after* BZ served two suspensions. *Id.* at ¶¶ 99–100. Bleau did not apologize to BZ, and no other student was punished. *Id.* at ¶¶ 101–02.

---

[5] As this Court reads the complaint, Zimny is alleging direct bullying claims against Defendants Jones and Bleau, but not against the District. *See* Am. Cplt., at 45–47 (Dckt. No. 5). If Zimny intended to bring a claim against the District under a direct bullying theory, then Zimny can file a motion for leave to amend.

Now take Assistant Principal Jones. After another student struck BZ with a hockey stick, Jones came into the nurse's office while BZ was receiving treatment and began to ask rapid-fire questions in a threatening manner. *Id.* at ¶¶ 130–32.

Then, on BZ's first day back at school after the hockey stick incident, Jones called BZ into the office for questioning and yelled at BZ. *Id.* at ¶ 147. BZ told Jones that he felt unsafe and wanted to call his dad, but Jones screamed at BZ that "he was not going anywhere." *Id.* at ¶¶ 149–51. And Jones later called the Illinois Regional Office of Education to report BZ as truant, even though BZ's situation didn't fit within the definition of truancy. *Id.* at ¶ 187.

So, Bleau and Jones committed actions falling under the umbrella of direct bullying. The Court must next consider whether the direct bullying by Jones and Bleau rises to the level of "conscience-shocking."

Shocking the conscience is a high bar. "The Supreme Court has held that state action that shocks the conscience is conduct which may be deemed arbitrary in the constitutional sense. . . . Only the most egregious official conduct will satisfy this stringent inquiry." *Jackson*, 653 F.3d at 654 (cleaned up).

Although the shock the conscience standard defies precise measurement, "only conduct falling towards the more culpable end of the tort law spectrum of liability will be found to shock the conscience." *Id.* at 655; *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Official conduct may be particularly shocking when it involves a disabled student. *See Doe v. Bd. of Educ. of City of Chicago*, 611 F. Supp. 3d 516, 538 (N.D. Ill. 2020).

Whether conduct shocks the conscience is a fact-intensive question. *See Lewis*, 523 U.S. at 850. For that reason, the question is often decided at summary judgment or trial, rather than on a motion to dismiss. *See Black ex rel. J. D. v. Littlejohn*, 2020 WL 469303, at *5 (N.D. Ill.

32

2020); *see also Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, 30 F. Supp. 3d 780, 790 (C.D. Ill. 2014) ("Whether conduct 'shocks the conscience,' however, is a fact-bound inquiry that, in this case, is not appropriately decided at the motion-to-dismiss stage.").

Taking the facts in the light most favorable to Zimny, it is plausible that Defendants' actions shocked the conscience. BZ is a disabled student. He is a vulnerable middle-school kid. As Zimny tells it, Bleau punished BZ especially harshly because of his disability status, and blew up at BZ in a meeting. *See* Am. Cplt., at ¶¶ 91–96 (Dckt. No. 5).

Specifically, Bleau screamed at BZ while roughing up the furniture. That combination of yelling plus physicality could be construed as conscience shocking. Scaring the living daylights out of a disabled student, and putting him at fear for his personal safety, might give rise to a claim about shocking the conscience.

For his part, Jones asked BZ questions in a threatening way after another student attacked BZ in gym class. *Id.* at ¶¶ 130–32. And on another occasion, Jones called BZ into the office, yelled at BZ, and threatened BZ that "he was not going anywhere." *Id.* at ¶¶ 149–51. In light of BZ's age, disability, and the setting, that behavior could be conscience shocking.

Also, Jones allegedly reported to state authorities that BZ was truant – despite knowing that BZ's situation did not fall under the definition of truancy. *Id.* at ¶¶ 187, 189. One could infer that Jones intentionally misreported BZ as truant – knowing the potential consequences of that action.

In short, Zimny has pled enough to support an inference of direct bullying by both individual defendants. The Court thus denies the motion to dismiss Count IV for the direct bullying allegations.

### B.  State-Created Danger Theory

The next question is whether Count IV states a claim against Defendants for the student bullying under a state-created danger theory.

"Generally, state actors do not have a due process obligation to protect citizens from private violence." *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272–73 (7th Cir. 1990) ("Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them.").

A narrow exception to the rule applies for "state created danger." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007); *see also Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). To prevail on a state-created danger theory, a plaintiff must show: "(1) that the state . . . by its affirmative acts, created or increased a danger that [the plaintiff] faced; (2) that [the state's] failure to protect [the plaintiff] from danger was the proximate cause of her injury; and (3) that [the state's] failure to protect [the plaintiff] shocks the conscience." *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015); *see also King*, 496 F.3d at 818.

Defendants contend that Zimny's claim fails on the first and third prongs of this analysis. They argue that the state did not create or increase the danger – the bullies did. And they argue that the failure to protect does not shock the conscience. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 21–23 (Dckt. No. 17). The Court takes each argument in turn.

As the name suggests, the state-created danger theory is about a danger created by the state itself, not by others. *See T.E.*, 599 F.3d at 589. The state-created danger theory is not about a freestanding duty to protect.

A plaintiff must show that the state "by its affirmative acts, created or increased a danger that [the plaintiff] faced." *D.S.*, 799 F.3d at 798. The state's actions must have "instigated, created, or increased the bullying that [the student] experienced at school." *Id.*

The standard "create *or increase* must not be interpreted so broadly as to erase the essential distinction between endangering and failing to protect." *See Sandage v. Bd. of Comm'rs*, 548 F.3d 595, 599 (7th Cir. 2008) (emphasis in original); *see also Doe v. Village of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015). "The former may amount to a constitutional violation if other facts are present; the latter is simple negligence." *Est. of Her v. Hoeppner*, 939 F.3d 872, 877 (7th Cir. 2019). "If all that were required was a causal relation between inaction and harm, the rule of *DeShaney* would be undone . . . ." *Sandage*, 548 F.3d at 599.

So, "[w]hen courts speak of the state's 'increasing' the danger of private violence, they mean the state *did something* that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." *Id.* at 600 (emphasis added); *see also Buchanan-Moore*, 570 F.3d at 827 ("[T]he so-called state-created danger exception provides that 'liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.'"); *Paine v. Cason*, 678 F.3d 500, 510 (7th Cir. 2012) ("Several decisions in this and other circuits hold that people propelled into danger by public employees have a good claim under the Constitution."). Generally, for the state-created danger exception to apply, the victim must be "safe before the state intervenes and unsafe afterward." *See Sandage*, 548 F.3d at 599.

"There is a difference between doing *nothing* and doing *harm*. Doing nothing cannot give rise to a claim, because inaction is not state action that deprives a person of life. But an

affirmative act that makes the situation *worse* – by exposing the person to a new danger, or by placing the person in greater peril – potentially can give rise to a claim. The key principle is all too familiar: 'do no harm.'" *See Fields v. Klegman*, 2022 WL 971529, at *7 (N.D. Ill. 2022).

Bullying by other students typically does not give rise to a claim against the school as a state-created danger. "[C]ourts have held routinely that a school's failure to prevent student-on-student harassment, assault, and bullying is not a state-created danger." *See Brookman v. Reed-Custer Cmty. Unit, Sch. Dist. 255-U*, 2019 WL 4735395, at *7 (N.D. Ill. 2019); *see also D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798–99 (7th Cir. 2015) (finding "inaction or ineffective response to . . . bullying" did not constitute a state-created danger); *A.S. ex rel. F.S. v. Bd. of Educ. for Des Plaines Sch. Dist. #62*, at *3 (N.D. Ill. 2023) (same); *Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, 2022 WL 170047, at *5 (N.D. Ill. 2022) (same); *Funes ex rel. C.F. v. Gardner Consolidated School Dist. 72C*, 2022 WL 1556104, at *4 (N.D. Ill. 2022) (same); *Doe v. Evergreen Park Elementary Sch. Dist. 124*, 2017 WL 6731867, at *6–7 (N.D. Ill. 2017) (same); *Riverside-Brookfield*, 1995 WL 680749, at *5–6 (N.D. Ill. 1995) (same).

A failure to respond to bullying is not enough to give rise to a claim. "[A] school's inaction or inadequate response to bullying does not 'increase the danger' under a state-created danger due process theory." *Doe v. Evergreen Park Elementary Sch. Dist. 124*, 2017 WL 6731867, at *6 (N.D. Ill. 2017) (St. Eve, J.).

That rule applies even when the attack on the student involves extreme conduct. For example, in *Spruill ex rel. D.N.S. v. Bd. of Educ. of City of Chicago*, 544 F. Supp. 3d 839 (N.D. Ill. 2021), the court confronted a claim about a sexual assault that a student committed against another student in a school bathroom. Judge Feinerman ruled that the state-created danger doctrine did not apply. "The most the complaint alleges of any defendant is *awareness* of [the

attacker's] proclivity for sexual violence and *inaction* as to measures that might have protected [the student] from further violence." *Id.* at 844 (emphasis in original).

"Missing is any allegation of an *affirmative* act by any defendant. The complaint's gist, in short, is that school officials knew that a certain student was a predator but stood idly by, thus leading to another attack. That conduct may have been negligent – and perhaps a violation of state law or federal statutory law, neither of which Spruill invokes – but it does not rise to the level of a due process violation under Seventh Circuit precedent interpreting *DeShaney*." *Id.*

The same conclusion applies here. The complaint does allege quite a few episodes of bullying against BZ. The complaint also alleges that the school was aware of the bullying. And the complaint alleges that the school could have done more to prevent it.

Even so, the complaint does not allege that the school took affirmative steps to place BZ in danger. The complaint does not allege, for example, that the school purposefully put BZ in a gym class full of bullies, knowing that they were ready and willing to brutalize BZ. The complaint does not allege that anyone from the school encouraged any student to attack BZ, or goaded the students on when they picked on BZ, anything of that sort.

At bottom, the complaint alleges that the school did not make BZ safe. But the complaint does not allege that the school made things *unsafe* for BZ. So it does not allege a claim under the state-created danger theory.

The complaint does not allege that the state created the danger, so the complaint fails at prong one. As a result, there is no need to reach the other argument, that is, whether the complaint satisfies the shock the conscience prong.

In sum, Count IV is dismissed as it pertains to Bleau and Jones in their official capacities, without prejudice, because they are redundant in light of the claim against the District. The

Court grants the motion to dismiss Count IV against the District, Bleau, and Jones under the state-created danger theory. The Court denies the motion to dismiss Count IV against the District, and against Bleau and Jones in their individual capacities, under the direct bullying theory.

## IV.     Intentional Infliction of Emotional Distress (Count V)

Count V, the only state law claim, alleges that Principal Bleau and Assistant Principal Jones intentionally inflicted emotional distress on BZ.

To prove an intentional infliction of emotional distress claim under Illinois law, a plaintiff must show that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)).

Defendants argue that the complaint falls short on the first element, meaning whether "Defendants' conduct was extreme or outrageous." *See* Defs.' Reply, at 5 (Dckt. No. 20). Defendants do not challenge the sufficiency of the pleadings on elements two and three.

So the Court considers only whether BZ has adequately pled that Defendants' conduct was "extreme and outrageous."

"To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen-El*, 602 F.3d at 864 (quoting *Kolegas*, 607 N.E.2d at 211). "Mere insults, indignities, threats, annoyances, petty oppressions or trivialities" are not extreme and outrageous. *Ulm v. Mem'l Med. Ctr.*, 964 N.E.2d 632, 642 (Ill. App. Ct. 2012).

The Illinois Supreme Court has identified three factors for assessing the outrageousness of a defendant's conduct:  (1) the amount of power or control the defendant has over the plaintiff; (2) whether the defendant reasonably believed its objective was legitimate; and (3) whether the defendant knew the plaintiff was "particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."  *See McGrath v. Fahey*, 533 N.E.2d 806, 809–811(Ill. 1988).

These factors are not exclusive, and none is "necessarily critical to a cause of action for intentional infliction of emotional distress.  The outrageousness of a defendant's conduct must be determined in view of all the *facts and circumstances* pleaded and proved in a case." *Id.* at 811 (emphasis added).  In other words, outrageousness is a fact-bound determination.

Zimny alleges that Bleau accused BZ of threatening to shoot another student and tried to "manipulate" him into saying he had done so.  *See* Am. Cplt. at ¶¶ 79, 91(Dckt. No. 5).  After attempting to manipulate BZ, Bleau kicked his chair, slammed his hand on the table, and started screaming at BZ.  *Id.* at ¶ 94.

For his part, Jones allegedly bombarded BZ with questions in the nurse's office after BZ was struck with a hockey stick.  *Id.* at ¶ 130.  And when BZ grew anxious, Jones told BZ that he could not call his father or leave the nurse's office.  *Id.* at ¶¶ 131–32.

As Geneva Middle's principal and assistant principal, respectively, Bleau and Jones had significant power and control over BZ.  As confirmed by a list in the comments to the Second Restatement of Torts, "school authorities" are an example of "individuals who may be positioned to exercise power or authority over a plaintiff."  *McGrath*, 533 N.E.2d at 810 (citing the Restatement (Second) of Torts); *see also Black*, 2020 WL 469303, at *8 (concluding that the

plaintiff "alleged enough to make her claims plausible, particularly because they involve acts by teachers").

Getting sent to the principal's office makes a kid nervous. Same goes for having the assistant principal confront you in the nurse's office. And BZ had a reason to fear his office visits: he had received punishment from Bleau and Jones before the incidents in question. Jones had given BZ an in-school detention after the Doritos incident, while Bleau had punished him with an in-school suspension. *See* Am. Cplt. at ¶¶ 70, 86 (Dckt. No. 5).

The pleadings also support an inference that Bleau and Zimny knew BZ was especially susceptible to emotional distress. Zimny pleads that Bleau and Jones knew about BZ's various diagnoses – including autism and unspecified anxiety disorder. *Id.* at ¶¶ 12–13, 16. A child with BZ's diagnoses could be more susceptible to emotional distress than the average 12-year-old.

Given BZ's age and disability, Zimny plausibly pleads that Defendants' conduct was extreme and outrageous. Therefore, the motion to dismiss Count V is denied.

## V. Rehabilitation Act and John Zimny (Count VI)

Count VI is a claim by John Zimny (again, BZ's father) for a violation of Section 504 of the Rehabilitation Act. Zimny alleges that he was discriminated against due to his association with BZ, a person with disabilities. *See* Am. Cplt., at 47–49 (Dckt. No. 5).

Under Section 504, nondisabled people have standing to bring claims where they are injured because of their association with a disabled person. *See Doe v. Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *5 (N.D. Ill. 2020) (Dow, J.). The statute's relevant language provides that "any person aggrieved by any act or failure to act by any recipient of Federal assistance" has standing to sue. *See* 29 U.S.C. § 794a(a)(2).

However, "the exact circumstances under which non-disabled plaintiffs may bring such claims is not entirely clear." *Doe v. Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *5; *see also McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014). The Seventh Circuit has not yet addressed this issue. *See Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003).

Still, in decisions interpreting other statutes' use of the same "aggrieved" language, both the Seventh Circuit and the Supreme Court have interpreted the language more narrowly. *See Doe v. Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *5 (collecting cases); *see also Richards v. N.L.R.B.*, 702 F.3d 1010, 1014 (7th Cir. 2012) (NLRB orders); *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011) (Title VII).

And courts in this district have concluded that, to bring an associational discrimination claim, "the plaintiff must 'suffer some specific, separate, and direct injury as a result of his association with the disabled individual.'" *Hale v. Pace*, 2011 WL 1303369, at *5 (N.D. Ill. 2011) (quoting *Micek v. City of Chicago*, 1999 WL 966970, at *3 (N.D. Ill. 1999)); *see also Doe v. Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *6 (N.D. Ill. 2020). "In cases where an associational discrimination claim succeeded, the nondisabled plaintiffs could claim that they themselves were discriminated against or singled out in a discriminatory way due to their association with disabled persons." *Hale*, 2011 WL 1303369, at *5 (cleaned up).

The line between indirect and direct injuries is sometimes thin. *Compare Doe*, 2020 WL 1081726, at *6 (dismissing associational discrimination claim brought by mother who spent work time dealing with phone calls about disabled son); *and Simenson v. Hoffman*, 1995 WL 631804, at *6 (N.D. Ill. 1995) (dismissing parents' associational discrimination claim where alleged injury was denial of medical services to their child); *with Hale*, 2011 WL 1303369, at *5

41

(finding a direct injury where plaintiff was denied services for herself as caretaker to a disabled person).

Here, Zimny alleges that "[t]he bullying BZ. received at the hands of the District 304 personnel or due to the actions of the District 304 personnel caused John Zimny, due to his association with a son with disabilities, tremendous stress, frustration, and mental anguish." *See* Am. Cplt., at 48, ¶ 234 (Dckt. No. 5).

At bottom, Zimny alleges that he experienced "stress, frustration, and mental anguish" because of what happened to his son. *See* Am. Cplt., at ¶ 236 (Dckt. 5). He also needed to devote work time to dealing with BZ's bullying and disciplinary issues. *Id.*

Basically, Defendants discriminated against *BZ* – not Zimny. Because of that discrimination, Zimny dealt with emails, phone calls, and trips to the principal's office. *Id.* at ¶ 236. Zimny was injured simply because BZ was injured – his injury does not stand alone. So, it's an indirect injury.

And Zimny seems to concede as much in his response to the motion to dismiss. He argues that he was "denied the right to have *his son* peaceably attend school" without "need[ing] to engage in repeated phone calls, email exchanges, and multiple meetings at school." *See* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 14 (Dckt. No. 18) (emphasis added). In other words, his injury came only because BZ was injured. *See Doe v. Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *6 (dismissing plaintiff's claim where she argued that she "experienced 'stress, frustration, and mental anguish' upon learning of [her son's] mistreatment . . . and [] had to expend emotional energy and work time dealing with [a school official's] phone calls").

Therefore, Count VI is dismissed.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.

The Court denies the motion to dismiss Counts I and II (the Rehabilitation Act and ADA claims) against the District. The motion to dismiss Counts I and II is granted as to Jones and Bleau. Counts I and II against Jones and Bleau are dismissed with prejudice, because the Rehabilitation Act and ADA do not provide for individual liability.

Count III (the procedural due process claim) is dismissed in its entirety. Specifically, Count III is dismissed without prejudice against the District, and against Jones and Bleau in their individual capacities, because Zimny failed to plead that state law remedies were inadequate. Count III is dismissed without prejudice as to Jones and Bleau in their official capacities, because those claims are redundant of the claims against the District. Also, the Court concludes that BZ has adequately pleaded a protectible interest only as it relates to the two-day suspension. To the extent that the procedural due process claim is based on anything else, BZ has not adequately pleaded a protectible interest.

The Court grants in part and denies in part the motion to dismiss Count IV (the substantive due process) against the District and against Jones and Bleau in their individual capacities. The motion to dismiss is granted as to the state-created danger theory, and is denied as to the direct bullying theory. The Court grants the motion to dismiss Count IV against Jones and Bleau in their official capacities without prejudice because the official capacity claims are redundant of the claim against the District.

The Court denies the motion to dismiss Count V (the intentional infliction of emotional distress claim).

The Court grants the motion to dismiss Count VI (the Rehabilitation Act claim brought by John Zimny) without prejudice.

Date:  February 21, 2024

Steven C. Seeger
United States District Judge